**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 9, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CLARENCE REINHART; GANELLE
EDWARDS; LARRY REINHART,

      Plaintiffs - Appellants,

  v.

LINCOLN COUNTY; LINCOLN
COUNTY PLANNING AND ZONING
COMMISSION; LINCOLN COUNTY
OFFICE OF PLANNING; KENT
CONNELLY; T. DEB WOLFLEY;
ALAN LINFORD, individually and in
their official capacities as Lincoln
County Commissioners; MIKE
ARCHIBALD, individually and in his
official capacity as planner for Lincoln
County Planning and Zoning Office,

      Defendants - Appellees,

---

NATIONAL ASSOCIATION OF
HOME BUILDERS,

      Amicus Curiae.

No. 06-8028

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 05-CV-089-CAB)**

Laurence William Stinson, Bonner Stinson, P.C., Powell, Wyoming, (John D. Bowers, Bowers & Associates Law Offices, PC, Afton, Wyoming, with him on the briefs), for Plaintiffs - Appellants.

Richard S. Rideout, Law Offices of Richard Rideout, P.C., Cheyenne, Wyoming, for Defendants - Appellees.

---

Before **HARTZ**, **SEYMOUR**, and **O'BRIEN**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

The Reinharts (Plaintiffs Clarence Reinhart and his daughter and son, Ganelle Edwards and Larry Reinhart) appeal the district court's order dismissing their disparate-impact claim under the Fair Housing Act (FHA). Defendants are Lincoln County, the Lincoln County Planning and Zoning Commission, the Lincoln County Office of Planning, and four Lincoln County officials in their individual and official capacities. The Reinharts claimed that a new comprehensive land-use plan and amended land-use regulations enacted by Lincoln County in 2005 had a discriminatory effect on persons protected by the FHA. The district court granted Defendants' motion for summary judgment on the claim, and the Reinharts appeal. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

# I. BACKGROUND

## A. Land-Use Regulations

In 2002 the Reinharts, who were interested in creating a subdivision of "affordable" one-acre lots in Lincoln County, Wyoming, attempted to develop property near Etna (a community within the County) but were unable to obtain approval from the town's water board. Sometime between 2002 and 2004 they notified Defendants of their intent to subdivide land near a subdivision that they had previously developed. The Reinharts assert that the County's comprehensive plan at the time would have permitted a subdivision with lots having an average size of one acre. It appears that the Reinharts did not intend to build homes on the lots in their proposed subdivision, but rather to sell individual lots.

On April 14, 2004, Lincoln County commissioners, allegedly aware of the Reinharts' plan for a subdivision, adopted an emergency moratorium on land-use permits in unincorporated portions of the County, purportedly because of unprecedented growth in the area. While the moratorium was in effect, Defendants developed a new comprehensive plan and land-use regulations. On January 4, 2005, they adopted the new plan, and on May 4 they adopted new regulations and lifted the moratorium. Amended versions of the plan and regulations were adopted on July 6, 2005.

According to the Reinharts, the new regulations divide most of north Lincoln County into (1) mixed-use zones, accounting for roughly 10% of the area,

which permit high-density housing and commercial and industrial uses, and (2) rural zones, accounting for roughly 90% of the area, which permit residential development of five-acre lots. (Three other zoning categories used in the County—recreational zones, industrial zones, and public zones—are not at issue in this litigation.) The Reinharts contend that neither the mixed-use nor the rural zones are suitable for affordable housing. The as-yet undeveloped areas in mixed-use zones, they say, are small and located near highways but far from services, which means that providing services would be too expensive for affordable housing. On the other hand, the rural zones are allegedly unsuitable because of the high minimum-lot-size requirement. In addition, they assert that affordable housing is further hampered by the requirements in the new regulations of costly developer improvements, such as enhanced septic systems—allegedly twice as expensive as those required by state and federal agencies—and paved roads.

Although the Reinharts repeatedly refer to their development plans as focused on "develop[ing] affordable lots," Aplt. Br. at 6, for "affordable housing," *id*. at 7, they do not contend that the lots they seek to sell, or the homes that would ultimately be built upon them, would qualify as "affordable" under regulations of the United States Department of Housing and Urban Development (HUD). Under these regulations, housing is "affordable" only if it is acquired by a family whose annual income does not exceed 80% of the median income for the area. *See* 24 C.F.R. §§ 92.2 (definition of low-income families), 92.252 (affordable housing for

lease must be rented by low-income families), 92.254(a)(3) (affordable housing for sale must be purchased by low-income families).  The Reinharts assert that the 2005 median family income for Lincoln County was $54,000, which means that "affordable housing" in the County would have to be acquired by a family with an income below $43,201.

**B.     District-Court Proceedings**

On March 21, 2005, the Reinharts filed a complaint against Defendants in the United States District Court for the District of Wyoming.  At that time the new comprehensive plan had been adopted, but the new land-use regulations were only proposed and the moratorium was still in effect.  The complaint stated seven claims, including disparate-treatment and disparate-impact claims under the FHA, alleged violations of the Equal Protection Clause and Takings Clause of the United States Constitution, and three state-law claims.  In their disparate-impact claim the Reinharts contended that the combination of costly required development improvements and a zoning scheme that limits the locations of higher-density housing has a discriminatory effect on members of groups protected under the FHA.  They sought to enjoin Defendants from continuing the land-use permitting moratorium (which was later lifted on May 4, 2005) and from enforcing land-use restrictions that prevented protected groups from gaining affordable housing in Lincoln County.  They also sought damages and attorney fees.

Defendants moved for summary judgment. As to the disparate-impact claim, they contended that the Reinharts had failed to provide any statistical support showing that the new regulations had a disparate impact on housing for protected classes:

> Although discriminatory effect is generally shown by statistical evidence, any statistical analysis must be appropriate, relevant, and the comparables should focus on the local housing market and statistics. Here, any statistical support proffered by the Plaintiffs must focus on Lincoln County and the relationship between the [land-use regulations] and the availability of housing for the protected class members and how that operates to discriminate against those individuals. To date, none have been proffered.

Defs.' Mem. in Supp. of Mot. for Summ. J. at 10, *Reinhart v. Lincoln County*, No. 05-CV-89-B (D. Wyo. Jan. 27, 2006). Defendants further contended that even if the Reinharts had made out a prima facie disparate-impact claim, the claim would still fail because "the specific regulations that the Plaintiffs complain about are all justifiable on the basis of the public health, safety, and welfare." *Id.* at 11–12.

In response the Reinharts proffered affidavits indicating that those in Lincoln County with incomes too low to afford a $200,000 house were disproportionately members of protected classes, including racial minorities and female-headed, single-parent households, and that the new regulations would increase the cost of real estate in the County. They also provided statistics indicating that the demand for affordable housing in the County was increasing.[1]

---

[1] The Reinharts' two other challenges to provisions in the new regulations
(continued...)

The district court dismissed the Reinharts' federal claims and declined to exercise jurisdiction over the state-law claims, dismissing them without prejudice. Addressing the disparate-impact claim, the court acknowledged that the Reinharts had proffered sufficient evidence "to show that protected class members generally have lower incomes than the general population of the area," and said that they had "offered sufficient evidence to show that the [new regulations] will increase the cost of residential development and the cost of a residential lot within the Rural Zone." Aplt. App. at 18–19 (Order Granting Defs.' Mot. for Summ. J., March 14, 2006 (District Court Order)). But it concluded that they had "failed to show that [the effect of the new regulations was] discriminatory because the increased costs are imposed upon all residents of Lincoln County regardless of their race or family status." *Id.* at 19. The court relied on dictum in *Hemisphere Building Co. v. Village of Richton Park*, 171 F.3d 437 (7th Cir. 1999), rejecting a

---

[1](...continued)
have not been adequately preserved for review. First, the Reinharts claimed that the regulations unduly restrict the rights of larger families to subdivide their property because parents with more than two children must make development improvements and file a performance guarantee if they wish to grant parcels to each child. Although the Reinharts mention this issue twice in their opening brief, their passing reference to "land use regulations that treat larger families differently than smaller families," Aplt. Br. at 10, and their subsequent citation to 101 pages of the record are insufficient to merit review. *See Ambus v. Granite Bd. of Educ.*, 975 F.2d 1555, 1558 n.1 (10th Cir. 1992), *modified on other grounds on reh'g*, 995 F.2d 992 (10th Cir. 1993).

The Reinharts also claimed in district court that they were barred from developing any property with a grade of 6% or more. They do not repeat this contention on appeal.

disparate-impact claim that was based solely on the proposition that zoning regulations that increase housing costs would disproportionately affect members of protected groups, *id.* at 440 ("Anything that makes housing more expensive hurts handicapped people; but it would be absurd to think that the [Fair Housing Amendments Act] overrides all regulation of home construction.  This is true whether the argument is made in the name of [reasonable] accommodation or . . . in the name of disparate impact [under the FHA].").  The court stated that "[t]his is not a case where the discriminatory effect is 'functionally equivalent to intentional discrimination.'"  Aplt. App. at 21 (District Court Order) (quoting *Mountain Side Mobile Estates P'ship v. Sec'y of HUD*, 56 F.3d 1243, 1251 (10th Cir. 1995)).  The court thus concluded that the Reinharts "have failed to make a prima facie case of disparate effect, [and] there is no need to examine the County's justifications for these regulations."  *Id*. at 23.

On appeal the Reinharts challenge only the dismissal of the disparate-impact claim.

## II.  DISCUSSION

### A.  Standard of Review

"We review summary judgment orders de novo and may affirm the district court's [grant of summary judgment] on any grounds adequately presented below." *Medina v. City & County of Denver*, 960 F.2d 1493, 1500 (10th Cir. 1992).  Under Fed. R. Civ. P. 56(c) summary judgment is appropriate if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "[W]e view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Terra Venture, Inc. v. JDN Real Estate-Overland Park, L.P.*, 443 F.3d 1240, 1243 (10th Cir. 2006) (internal quotation marks and ellipsis omitted).

## B.    Disparate-Impact Claim

The FHA, 42 U.S.C. §§ 3601–3619, makes it unlawful "[t]o refuse to sell or rent . . . , or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status or national origin," *id.* § 3604(a), or because of handicap, *id.* § (f)(1). *Dwelling* is defined as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any *vacant land* which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." *Id.* § 3602(b) (emphasis added). "Discrimination may occur either by disparate treatment or disparate impact." *Mountain Side*, 56 F.3d at 1250. A disparate-treatment claim requires proof of "differential treatment of similarly situated persons or groups," *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995) (internal quotation marks omitted); the discrimination must be intentional, *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir.

2003).  A disparate-impact claim, on the other hand, challenges a facially neutral policy that "actually or predictably results in . . . discrimination." *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir.) (internal quotation marks omitted), *aff'd*, 488 U.S. 15 (1988).  The plaintiff need not show that the policy was formulated with discriminatory intent.  *See id.*  Additionally, "a refusal to make reasonable accommodations in rules, policies, practices, or services" as may be "necessary to afford [handicapped] person[s] equal opportunity to use and enjoy a dwelling" is prohibited.  42 U.S.C. § 3604(f)(3)(B); *see Keys Youth Servs., Inc. v. City of Olathe, Kan.*, 248 F.3d 1267, 1275 (10th Cir. 2001).

"To establish a prima facie case of disparate impact discrimination, plaintiffs must show that a specific policy caused a significant disparate effect on a protected group." *Mountain Side*, 56 F.3d at 1251.  "Once plaintiffs establish a prima facie case of disparate impact, the burden shifts to the defendant to produce evidence of a genuine business need for the challenged practice." *Id.* at 1254 (internal quotation marks omitted).  In weighing the defendant's justifications against the disparate impact, we consider three factors:

> (1) the strength of the plaintiff's showing of discriminatory effect; (2) the defendant's interest in taking the action complained of; and (3) whether the plaintiff seeks to compel the defendant affirmatively to provide housing for members of a protected class or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

*Id.* at 1252.

In our view, the Reinharts have failed to "show that a specific policy caused a significant disparate effect on a protected group." *Id.* at 1251. The Reinharts have therefore not established a prima facie case, and we need not address the three factors articulated in *Mountain Side. See Huntington*, 844 F.2d at 935 (factors weighing plaintiff's showing against defendant's justifications "are to be considered in a final determination on the merits rather than as a requirement for a prima facie case").

The Reinharts' disparate-impact claim is premised on the alleged additional costs imposed by the new regulations. These costs, they say, make it impossible for them to provide affordable housing, thereby injuring protected groups. We recognize that one court has suggested that a disparate-impact claim based solely on increased costs is not cognizable under the FHA. *See Hemisphere*, 171 F.3d at 440. But we need not decide that issue. Even if such a claim could be made, the Reinharts fall short. To establish that the new regulations disparately impact a protected group under their theory, they would need to show that the new regulations increase the cost of a dwelling by some amount and then show that this increase disparately impacts the ability of members of the protected group to buy a dwelling—that is, to the extent that the higher price reduces the size of the purchaser market for the dwelling, the reduction is disproportionately high for the protected group. These requirements simply reflect what it means for a specific

-11-

policy (in this case, the new regulations) to affect a protected group disparately. *See Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006) (when evaluating disproportionate impact, court looks to the subset of the population affected by the challenged policy); *Tsombanidis*, 352 F.3d at 575 (disparate-impact claims are premised on a comparison between the composition of those affected and those unaffected by a facially neutral policy).

It is not enough for the Reinharts to show that (1) a regulation would increase housing costs and (2) members of a protected group tend to be less wealthy than others. It is essential to be able to compare who could afford the housing before the new regulations with who could afford it afterwards. For example, it may be that no members of protected groups could afford homes in the Reinhart development even if the former development regulations stayed in place. Or it may be that anyone who could afford a home built under the former regulations could still afford a home built under the new ones. In either of these situations there is no disparate impact on a protected group.[2] Accordingly, the

---

[2]An oversimplified example may illustrate the point. Assume that there are 20 people in the County, 10 of whom belong to a protected group. The following table shows the highest price for a home that each of the 20 can afford. Each row reflects the number of people who can afford a home with a price greater than the labeled amount on the next lower row but no greater than the labeled amount for that row. (Thus, the person on the "$200,000" row can afford a $200,000 house but not a $210,000 one.) The two cells in the row state how many of that number are in the protected group and how many are not.

(continued...)

Reinharts must provide evidence indicating before-and-after costs of dwellings and the percentages of protected and nonprotected persons who will be priced out of the market as a result of the increase. This they have failed to do—by a long shot.

At summary judgment the Reinharts provided evidence of the percentages of protected groups and of the general population of the County that could afford homes costing up to $200,000. They also provided evidence that the cost of

---

[2](...continued)

|  | Protected | Nonprotected |
|---|---|---|
| **$250,000** | 0 | 1 |
| **$200,000** | 1 | 0 |
| **$150,000** | 0 | 2 |
| **$100,000** | 1 | 3 |
| **$75,000** | 2 | 2 |
| **$50,000** | 6 | 2 |

The table shows that members of the protected group are less wealthy and on the whole less able than others to purchase more expensive homes. But no member of the protected group will be priced out of the market if the price of a home is increased from $125,000 to $150,000. Only one member of the group could afford a $125,000 home and that member could also afford a $150,000 home (or even a $200,000 home). A policy that causes prices to increase from $125,000 to $150,000 would therefore not have a discriminatory impact. Similarly, an increase in price from $90,000 to $115,000 would eliminate one of the members of the protected group (10% of the protected group) but three of the others (30% of the nonprotected group), hardly a disparate impact on the protected group. *See Hallmark*, 466 F.3d at 1286 (disparate impact is measured by comparing the percentage of protected members in the affected group to either (1) the protected group's percentage of the general population or (2) the nonprotected group's percentage of the affected group).

-13-

improvements to the average five-acre lot in the rural zone under the new land-use regulations would be $54,109, compared to $23,703 for a two-acre lot under the previous regulations, so that the sales price (for a lot of unspecified size) would increase from about $30,000 to about $60,000.

Even assuming the reliability of this evidence, it is not enough to support their disparate-impact claim. Although the Reinharts point to the increase in the price of *lots*, and the definition of *dwelling* in the FHA includes vacant lots to be used for housing, *see* 42 U.S.C. § 3602(b), the thrust of their claim is clearly that the disparate impact on protected groups is caused by the increased price of *housing* (else there is no point in their providing statistics regarding who can afford a $200,000 home). Yet the Reinharts told the district court nothing about the expected prices of homes in the development, or, more importantly, the amount by which those prices would exceed what they would have been absent the change in the regulations. And nothing in the Reinharts' income data (from which they could estimate the percentages of people who could afford a $200,000 house) would enable anyone to calculate the specific impact on protected groups, as compared to the general population, from an increase in home prices from $X$ to $Y$.

The showing by the Reinharts can be contrasted with showings of disparate impact that have been declared sufficient by other circuit courts. In the leading case of *Metropolitan Housing Development Corp. v. Village of Arlington Heights*,

558 F.2d 1283 (7th Cir. 1977), the plaintiffs challenged the village's failure to zone property to permit federally financed low-cost housing. The racial implications were clear:

> Because a greater number of black people than white people in the . . . area satisfy the income requirements for federally subsidized housing, the Village's refusal to permit [the plaintiffs] to construct the project had a greater impact on black people than on white people. Moreover, Arlington Heights remains almost totally white in a metropolitan area with a significant percentage of black people. Since [the proposed development] would have to be racially integrated in order to qualify for federal subsidization, the Village's action in preventing the project from being built had the effect of perpetuating segregation in Arlington Heights.

*Id.* at 1288.

In *Huntington*, 844 F.2d at 937, a developer sought to construct an integrated, federally subsidized apartment complex on a site in a neighborhood that was 98% white. The court held that the failure to rezone the site "had a substantial adverse impact on minorities." *Id.* at 938. To support this conclusion the court cited evidence that "28% of minorities in Huntington and 11% of whites have incomes below 200% of the poverty line," *id.*; "7% of all Huntington families needed subsidized housing, while 24% of the black families needed such housing," *id.*; "minorities constitute a far greater percentage of those currently occupying subsidized rental projects compared to their percentage in the Town's population," *id.*; and "a disproportionately high percentage (60%) of families holding Section 8 certificates from the Housing Authority to supplement their rents are minorities,

and an equally disproportionate percentage (61%) of those on the waiting list for such certificates are minorities," *id.*; *see also, e.g., Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 734, 742 (8th Cir. 2005) (plan to demolish low-income apartments, of which 46 out of 50 were occupied by African-American tenants); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 (4th Cir. 1984) (new adults-only policy of apartment owner resulted in eviction of 54.3% of the nonwhite tenants but only 14.1% of white tenants). Unquestionably, the Reinharts have produced nothing like the evidence of disparate impact found in these cases.

We recognize that our reasoning here differs from that employed by the district court. That court looked to *Hemisphere*, 171 F.3d at 440, in concluding that the Reinharts had failed to establish a prima facie case of disparate impact because the increased costs of development affected all residents of the County. The Reinharts and an *amicus curiae* brief filed by the National Association of Home Builders both challenge the applicability of *Hemisphere*. But we did not need to address that issue. Rather, we have affirmed on a ground not relied on by the district court but raised by Defendants in the district court and this court. *See Medina*, 960 F.2d at 1500 (in reviewing summary-judgment orders, we "may affirm the district court's order on any grounds adequately presented below").

## III.    CONCLUSION

We GRANT the National Association of Home Builders' Motion for Leave to File Amicus Brief out of Time.  We AFFIRM the district court's grant of summary judgment on the Reinharts' disparate-impact claim.