**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 24, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LARRY EMERSON;
STEPHANIE EMERSON,

       Plaintiffs,

   and

REVOCABLE TRUST OF CHARLEY
L. DAVIS; REVOCABLE TRUST OF
ANNIE O. DAVIS,

       Plaintiffs-Appellants,

v.

KANSAS CITY SOUTHERN
RAILWAY COMPANY,

       Defendant-Appellee.

No. 06-7081

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 05-CV-331-KEW)**

---

D. Kenyon Williams, Jr., Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.,
for Plaintiffs-Appellants.

W.G. "Gil" Steidley, Jr., Steidley & Neal, P.L.L.C. (C. Ryan Norton, Rex M.
Terry, Hardin, Jesson & Terry, PLC, with him on the brief), for
Defendant-Appellee.

---

Before **LUCERO,** Circuit Judge, **BRORBY**, Senior Circuit Judge, and **McCONNELL**, Circuit Judge.

---

**McCONNELL**, Circuit Judge.

---

This case concerns the preemptive scope of the Interstate Commerce Commission Termination Act of 1995 (ICCTA). Kansas City Southern Railway Company (Railroad), the defendant below, argued to the district court that the ICCTA preempts the state tort claims brought by the plaintiffs, who own land adjacent to the Railroad's track in Sequoyah County, Oklahoma. The district court accepted this argument and granted summary judgment in the Railroad's favor. After reviewing the record, however, we conclude that the ICCTA does not expressly preempt the plaintiffs' tort claims. We also conclude that there were insufficient facts in the record for the district court to determine whether the ICCTA impliedly preempts the plaintiffs' claims. We therefore REVERSE the judgment of the district court.[1]

I.

The plaintiff landowners in this case are the Revocable Trust of Charley L. Davis and the Revocable Trust of Annie O. Davis (Landowners). Their property

---

[1]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

abuts a floodplain drainage ditch that is adjacent to a portion of the Railroad's track. The ditch itself contains a culvert system. The Landowners allege that when the Railroad replaced old, deteriorated wooden railroad ties, it regularly discarded the used rails in the drainage ditch. They also allege that the Railroad failed to cut the vegetation in the drainage ditch on a regular basis, and that when it cut the vegetation, it disposed of the debris in the right-of-way. The Landowners claim that the improperly discarded railroad ties and vegetation debris impeded the flow of water through the drainage ditch and culvert system adjacent to their properties. This, in turn, allegedly resulted in a gradual build-up of sediment in the drainage ditch and in the flooding of the Landowners' property on a number of occasions. These incidents led the Landowners to sue the Railroad in Oklahoma state court, alleging state torts of trespass, unjust enrichment, public and private nuisance, negligence, and negligence per se. They sought actual and punitive damages, abatement, remediation, and other relief.

The Railroad removed the case to federal court, invoking the court's diversity jurisdiction. *See* 28 U.S.C. § 1441(b). It then filed a motion for summary judgment, arguing that the Landowners' state law claims were preempted by the ICCTA, Pub. L. No. 104-88, 109 Stat. 803 (codified at 49 U.S.C. §§ 10101-16106). The district court agreed. It held that "the facts which [were] necessary to evaluate whether federal preemption applies to

Plaintiffs' state law claim [were] not in dispute." Appellant's App. 124. The Landowners now appeal. We have jurisdiction under 28 U.S.C. § 1291.

## II.

"We review the grant of summary judgment de novo, applying the same legal standard employed by the district court." *King v. PA Consulting Group, Inc.*, 485 F.3d 577, 585 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, "'we view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007) (quoting *Terra Venture, Inc. v. JDN Real Estate-Overland Park, L.P.*, 443 F.3d 1240, 1243 (10th Cir. 2006)) (brackets omitted).

## III.

Congress has the power to pre-empt state law under Article VI of the Constitution, which provides that "the Laws of the United States shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI. *See Choate v. Champion Home Builders Co.*, 222 F.3d 788, 791 (10th Cir. 2000). Because of the supremacy of federal law, "state law that conflicts with federal law is 'without

effect,'" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)), be it state common law or statutory law, *see Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) ("Under the Supremacy Clause of the United States Constitution, Congress may preempt state common law as well as state statutory law through federal legislation."); *see also Dist. 22 United Mine Workers of Am. v. Utah*, 229 F.3d 982, 987 (10th Cir. 2000) (same).

Federal pre-emption of state law may be either express or implied. *Choate*, 222 F.3d at 792. Express pre-emption occurs when Congress "define[s] explicitly the extent to which its enactments pre-empt state law." *Id.* Implied preemption comes in two varieties. The first is field pre-emption, which occurs when "the scope of a statute indicates that Congress intended federal law to occupy a field exclusively." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002), *quoting Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995), *quoting English v. General Electric Co.* 496 U.S. 72, 78-79 (1990). The second is implied conflict pre-emption, which occurs when "it is 'impossible for a private party to comply with both state and federal requirements,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Sprietsma*, 537 U.S. at 64, *quoting Freightliner*, 514 U.S. at 287, *quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1951). *See Choate*, 222 F.3d at 792. Whatever its form, pre-emption analysis "starts with the assumption that the

historic police powers of the States are not to be superseded by . . . Federal Act unless that is the clear and manifest purpose of Congress. Accordingly, the purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone*, 505 U.S. at 516 (internal quotation marks, citations, and brackets omitted).

This case involves claims of both express and conflict preemption. *See Sprietsma*, 537 U.S. at 65 ("Congress' inclusion of an express pre-emption clause 'does *not* bar the ordinary working of conflict pre-emption principles.'") (quoting *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000)) (emphasis in original).

## A.    Express Preemption

The ICCTA states that "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). Because the ICCTA "contains an express pre-emption clause, our 'task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Sprietsma*, 537 U.S. at 62–63 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). The Act defines "transportation" as:

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property[.]

*Id.* § 10102(9)(A)–(B).

While certainly expansive, this definition of "transportation" does not encompass everything touching on railroads. Subsection (A) focuses on physical instrumentalities "related to the movement of passengers or property," and subsection (B) on "services related to that movement." We do not think that the plain language of this statute can be read to include the conduct that the Landowners complain of here—discarding old railroad ties into a wastewater drainage ditch adjacent to the tracks and otherwise failing to maintain that ditch. These acts (or failures to act) are not instrumentalities "of any kind related to the movement of passengers or property" or "services related to that movement." *Id.* Rather, they are possibly tortious acts committed by a landowner who happens to be a railroad company. Because these acts or omissions are not "transportation" under § 10102(9), the ICCTA does not expressly preempt the generally applicable state common law governing the Railroad's disposal of waste and maintenance of the ditch.

This reading is consistent with other interpretations of the ICCTA's preemptive scope. We look, for instance, to rulings by the Surface Transportation Board, the agency Congress created in the ICCTA, *id.* § 10102(1), and to which Congress gave "extensive authority in this area," *City of Lincoln v. Surface Transp. Bd.*, 414 F.3d 858, 861 (8th Cir. 2005). The STB has exclusive jurisdiction over:

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State[.]

49 U.S.C. § 10501(b). "As the agency authorized by Congress to administer the [ICCTA], the Transportation Board is uniquely qualified to determine whether state law should be preempted by the [ICCTA]." *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005) (internal quotation marks omitted); *see also R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 548 (6th Cir. 2002) ("[T]his Court must give considerable weight and due deference to the [STB's] interpretation of the statutes it administers unless its statutory construction is plainly unreasonable.") (second brackets in original; internal quotation marks omitted).

In one of its latest decisions addressing the preemptive scope of the ICCTA, the STB held:

> [T]he courts have found two broad categories of state and local actions to be preempted regardless of the context or rationale for the action. The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized.
>
> Second, there can be no state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines (*see* 49 U.S.C. §§ 10901–10907); railroad mergers, line acquisitions, and other forms of consolidation (*see* 49 U.S.C. §§ 11321–11328); and railroad rates and service (*see* 49 U.S.C. §§ 10501(b), 10701–10747, 11101–11124)[.]

*CSX Transp., Inc.–Petition for Declaratory Order*, 2005 WL 1024490, at *2-*4 (Surface Transp. Bd. May 3, 2005) (citations and footnote omitted) (denying petitions for reconsideration and reopening).

Subjecting the Railroad to state law would not cause this case to fall into either of these categories. State tort law obviously has no pre-approval component, as it necessarily addresses wrongs that have already occurred; and if the Landowners prevail on remand, the applicable remedy under state law would not deny the Railroad the ability to operate or to proceed with an STB-approved activity. Further, the STB does not directly regulate the Railroad's disposal of its old railroad ties or its maintenance of vegetation along its right-of-way.

While not necessary to our conclusion, our holding is confirmed by the ICCTA's legislative history, which shows that Congress did not intend to

pre-empt all state and federal law that might touch on a railroad's property or actions.  For example, one House Report states:

> The Conference provision [of 49 U.S.C. § 10501(b)] retains this general rule [of increased exclusivity for Federal remedies], while clarifying that the exclusivity is limited to remedies with respect to rail regulation—not State and Federal law generally.  For example, criminal statutes governing antitrust matters not pre-empted by this Act, and laws defining such criminal offenses as bribery and extortion, remain fully applicable unless specifically displaced, because they do not generally collide with the scheme of economic regulation (and deregulation) of rail transportation.

H.R. Rep. No. 104-422, at 167 (1995), reprinted in 1995 U.S.C.C.A.N. 850, 852.  We do not think that a generally applicable state law regulating the disposal of detritus, or maintenance of vegetation, collides with the Federal scheme of economic regulation or deregulation.  Such laws are general state laws that "remain fully applicable unless specifically displaced." *Id.*  We conclude that no such displacement has occurred here.

In addition, our holding finds support in the precedents of other courts.  For example, in *Rushing v. Kansas City Southern Railway Co.*, 194 F. Supp. 2d 493 (S.D. Miss. 2001), the court held that the ICCTA preempted state nuisance and negligence claims brought to quell noise and vibrations emanating from the railroad's switching yard.  Those causes of action, the court reasoned, sought "to enjoin the [railroad] from operating its switch yard in the manner it currently employs"—authority the ICCTA plainly and exclusively gives to the STB, not the states.  *Id.* at 500–01.

*Rushing*, however, also held that the ICCTA did not preempt plaintiffs' claims for negligence and nuisance based on the railroad's construction of an earthen berm, which "was constructed to reflect and absorb noise emissions originating from the rail yard" and resulted in "the pooling of rainwater on [the plaintiffs'] property." *Id.* at 501. The ICCTA did not preempt those claims because "the design/construction of the berm does not directly relate to the manner in which the Defendant conducts its switching activities." *Id.* The court also found "that an order . . . directing the [railroad] to compensate and correct drainage problems resulting from the construction of the berm would not implicate the type of economic regulation Congress was attempting to prescribe when it enacted the ICCTA." *Id.* The latter holding is closely analogous to our own.

In *Friberg v. Kansas City Southern Railway Co.*, 267 F.3d 439 (5th Cir. 2001), the Fifth Circuit held that the ICCTA preempted a negligence suit against a railroad by owners of a defunct business. The plaintiffs' theory was that their business failed because the railroad began more frequently using its side track near their store, and the increase in train crossings led to a decrease in customers. The court held that it was "beyond peradventure that regulation of KCS train operations, as well as the construction and operation of the KCS side tracks, is under the exclusive jurisdiction of the STB," *id.* at 443, because those items were specifically listed in the ICCTA. The court also noted that "[r]egulating the time

-11-

a train can occupy a rail crossing impacts, in such areas as train speed, length and scheduling, the way a railroad operates its trains, with concomitant economic ramifications." *Id.*

Likewise, in *City of Auburn v. United States*, 154 F.3d 1025, 1028, 1030–31 (9th Cir. 1998), the Ninth Circuit held that the ICCTA preempted state regulation requiring a railroad to conduct a local environmental review as a permitting precondition to re-establishing a certain railroad spur as a main route. The court found support for its holding in "the plain language of two sections of the ICCTA [that] explicitly grant the STB exclusive authority over railway projects" like the one in that case. *Id.* at 1030. It also disregarded the state's attempt to justify its permitting requirements as a valid exercise of state police power. It held that if "local authorities have the ability to impose 'environmental' permitting regulations on the railroad, such power will in fact amount to 'economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." *Id.* at 1031.

Though the courts in *Friberg* and *Auburn* concluded that the state laws in question were preempted, their reasoning supports our conclusion of non-preemption. These courts looked to the ICCTA's plain language and found a statutory provision that expressly granted the STB authority to govern the railroads' allegedly tortious actions. The courts also found that the states' regulations would have an adverse economic effect on aspects of the railroads'

operations that are within the STB's exclusive jurisdiction. Here, in contrast, no ICCTA provision gives the STB authority to dictate how the Railroad should dispose of detritus or maintain drainage ditch vegetation. Nor would the state remedies adversely affect the economic aspects of the Railroad's operations subject to STB control.

Moreover, the Railroad's argument has no obvious limit, and if adopted would lead to absurd results. If the ICCTA preempts a claim stemming from improperly dumped railroad ties, it is not a stretch to say that the Railroad could dispose of a dilapidated engine in the middle of Main Street—a cheap way to be rid of an unwanted rail car. After all, in this hypothetical, as in this case, the Railroad is merely disposing of unneeded railroad equipment in a cost-conscious fashion. Our holding, which is consistent with the ICCTA's legislative purpose, interprets the ICCTA's preemption clause such that this absurd result is avoided. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

In sum, based on the statute's plain language and the STB's interpretation of the statutory text, and consistent with the legislative history and precedent from other courts, we hold that the state tort remedies at issue in this case are not expressly preempted by § 10501(b).

## B.    Conflict Preemption

We next consider conflict preemption: whether it is impossible for the Railroad to comply with both Federal and Oklahoma law, or whether application

of the state tort laws at issue would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Choate*, 222 F.3d at 792.

As discussed above, Congress's purpose in passing the ICCTA was to establish an exclusive Federal scheme of economic regulation and deregulation for railroad transportation. But the STB has recognized that federal preemption under the ICCTA "does not completely remove any ability of state or local authorities to take action that affects railroad property. To the contrary, state and local regulation is permissible where it does not interfere with interstate rail operations, and localities retain certain police powers to protect public health and safety." *Maumee & W. R.R. Corp. and RMW Ventures, LLC—Petition for Declaratory Order*, 2004 WL 395835, at *1 (Surface Transp. Bd. Mar. 2, 2004). In a separate order, the STB gave examples of permissible state regulation:

> [T]here are areas with respect to railroad activity that are reasonably within the local authorities' jurisdiction under the Constitution. For example, even in cases where we approve a construction or abandonment project, *a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power*. Similarly, as noted by the Secretary, a state or local government could issue citations or seek damages if harmful substances were discharged during a railroad construction or upgrading project. *A railroad that violated a local ordinance involving the dumping of waste could be fined or penalized for dumping by the state or local entity*. The railroad also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or well being of the local community. We know of no court or agency ruling that such a requirement would constitute an unreasonable burden on, or

-14-

interfere with, interstate commerce. Therefore, such requirements are not preempted.

*Cities of Auburn & Kent, WA—Petition for Declaratory Order—Burlington N. R.R. Co.–Stampede Pass Line*, 2 S.T.B. 330, 1997 WL 362017, at \*6 (July 1, 1997) (emphasis added).

Circuit courts have agreed with the STB on this point. The Second Circuit has held that "not all state and local regulations are preempted [by the ICCTA]; local bodies retain certain police powers which protect public health and safety." *Green Mountain R.R.*, 404 F.3d at 643 (internal quotation marks omitted). It continued:

> [S]tates and towns may exercise traditional police powers over the development of railroad property, at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions. Electrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption.

*Id.*

The STB has held that to decide whether a state regulation is preempted "requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation." *CSX Transp., Inc.*, 2005 WL 1024490, at \*3. We agree with this standard and adopt it. We therefore hold that in order to decide whether § 10501(b) impliedly preempts

application of the Oklahoma tort laws at issue here, a factual assessment must be made as to whether requiring the Railroad to remedy the injury claimed by the Landowners would have the effect of preventing or unreasonably interfering with railroad transportation.

Applying that test, we conclude that the district court erred by granting summary judgment because the Railroad did not present sufficient evidence to satisfy its burden of production. *See Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005) ("Federal preemption is an affirmative defense upon which the defendants bear the burden of proof.").

The district court's order was grounded on an answer that the Landowners gave to an interrogatory requesting that they "describe in detail the actions [they] contend[ed] need[ed] to be performed n (sic) order to remedy the flooding problems described in the pleadings." Appellant's App. 47. Part of the Landowners' response was that "additional culverts or a railroad bridge/trestle should be installed to allow the unimpeded flow of surface storm water through and under Defendant's railroad." *Id*. The district court held that:

> Plaintiffs state that the manner in which they expect Defendant to rectify the drainage deficiencies along the track is to install "additional culverts or a railroad bridge/trestle." Clearly, any such measures bear directly upon the "practices," "operation," and "construction" in regard to Defendant's "facilities," namely the track in the affected area-matters which are expressly reserved to the exclusive jurisdiction of the STB.

*Id.* at 127. The district court reasoned that this interrogatory answer was sufficient to distinguish this case from *Rushing*'s second holding—that the ICCTA did not preempt a state negligence action—because "[w]ithout doubt, the construction of a trestle and culverts beneath the track which [Landowners] seek does directly relate to the operation of [Railroad's] track and would adversely impact upon [Railroad's] economic activities." *Id.* at 128.

We conclude, however, that the district court read too much into this interrogatory answer. Interpreting the evidence in the light most favorable to the party opposing summary judgment, as we must, the Landowners' response to the interrogatory was nothing more than a wish for a remedy that they would like to obtain. The Landowners' petition asked for actual and punitive damages, abatement and remediation, and other relief. The Landowners' answer to the interrogatory also stated that they would like to see the drainway resculpted "to its 1976 depth and configuration [to] restore the original design volume and enhance both flow and detention characteristics of the drainway"; that they wanted the Railroad to stop throwing its used ties into the drainage ditch; and that they wanted dead trees, vegetation, and debris removed from the drainage ditch on a regular basis. Appellant's App. 47. There is nothing in the record to suggest that the Landowners had any engineering or other expertise that would qualify them to provide an expert opinion on the precise steps that would need to be taken to prevent further flooding.

Therefore, while we agree that maintenance is an integral part of running a railroad, we do not agree that *any* state or local regulation of such maintenance or disposal of maintenance byproducts is necessarily preempted. And although it is possible that some potential remedies would have the effect of preventing or unreasonably interfering with railroad transportation, the record as it exists provides no clear indication of what actions by the Railroad could have prevented the previous flooding and what would be required of the Railroad at this time to remedy the situation. The district court therefore erred in granting summary judgment in favor of the Railroad.

IV.

The judgment of the district court is REVERSED, and the case is REMANDED to the district court for further proceedings.