# In the Iowa Supreme Court

No. 24–0509

Submitted September 9, 2025—Filed December 19, 2025

**Iowa Northern Railway Company,**

Appellee,

vs.

**Floyd County Board of Supervisors** and **Cerro Gordo County Board of Supervisors,** acting as trustees for **Joint Drainage District Nos. 6 and 56,**

Appellants.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Floyd County, Colleen Weiland, judge.

A joint drainage district seeks further review of a court of appeals decision that affirmed a writ of mandamus prohibiting the drainage district from requiring a railroad to construct a new culvert through a railroad embankment. **Decision of Court of Appeals Vacated; District Court Judgment Reversed and Case Remanded.**

McDermott, J., delivered the opinion of the court, in which all justices joined.

Robert W. Goodwin (argued) of Goodwin Law Office, P.C., Ames, for appellants.

Kimberly P. Knoshaug (argued) of Lewis, Webster, Van Winkle & Knoshaug, L.L.P., Des Moines, for appellee.

**McDermott, Justice.**

A joint drainage district sought to require the Iowa Northern Railway Company to install a 5.5-foot diameter steel pipe culvert through an embankment that supports one of its rail lines. Iowa Northern sued to stop the project, asserting that federal railroad law preempts state drainage law and bars the drainage district from compelling the culvert's installation. The district court concluded that the installation would jeopardize the rail line's operation and thus that the drainage district's authority under state law was preempted by federal law. The court of appeals affirmed. We granted the drainage district's application for further review.

I.

A drainage district is a special governmental entity that manages water drainage in a particular area to enable more productive uses of farmland. *Hardin Cnty. Drainage Dist. 55, Div. 3, Lateral 10 v. Union Pac. R.R.,* 826 N.W.2d 507, 510 (Iowa 2013). County boards of supervisors manage local drainage district affairs in a representative capacity. *Bd. of Water Works Trs. v. SAC Cnty. Bd. of Supervisors,* 890 N.W.2d 50, 54 (Iowa 2017) (citing Iowa Code §§ 468.37, .89, .231, .617 (2015)). The boards of supervisors may order repairs or improvements to maintain the efficiency or capacity of structures that facilitate drainage. Iowa Code § 468.126(1) (2019). Because the drainage district in this case crosses a county line, two counties—Floyd and Cerro Gordo—act as trustees for the joint drainage district (Nos. 6 and 56) involved here.

Iowa Northern is a short-line railroad, running about 200 miles throughout parts of northeast Iowa. Just outside Nora Springs, the railway's main rail line runs above a twenty-foot-high embankment. The embankment bisects the drainage district's natural waterway. An existing four-foot by six-foot

stone box culvert, built more than a century ago (and perhaps farther back than that), passes water through the embankment. The drainage tile is in poor condition, suffers from blowouts and blockages, and hasn't been substantially repaired since 1976.

In 2011, a landowner complaint about insufficient drainage led to an engineering study. The resulting 2014 engineer's report presented several options. The first proposed option, which was the engineer's initial recommendation, involved repairing the existing structures. A second option, which the nearby landowners preferred, involved deepening the open ditches on both sides of the embankment and installing a new 66-inch (5.5-foot) diameter steel pipe culvert through the embankment. The drainage district ultimately approved the second option. Among other problems, the drainage district's engineer determined that the existing box culvert sits at too high an elevation to adequately drain the water. Plans call for the new steel culvert to sit near, but farther below, the existing culvert, which will remain to handle overflow.

The steel culvert would be installed using the "jack and bore" method, a trenchless-construction technique designed specifically to allow surface traffic (whether road or rail) to continue uninterrupted during the construction. With this technique, instead of cutting a trench, a hydraulic jack pushes the steel pipe through the earth while an auger sits inside the pipe and removes the soil. Additional pipe is connected and jacked forward until the pipe reaches the other side, when the internal auger is removed. Throughout this process, devices continuously monitor the track for any movement. If the track moves more than one-quarter inch, both construction and rail traffic are halted.

Iowa Northern filed this action seeking a writ of mandamus against the drainage district and the counties to stop the project. In a mandamus action, a

party generally attempts to compel a government official, public body, or lower court "to do or not to do" some action because the action is required or prohibited by law. Iowa Code § 661.1. After a remand from the federal Surface Transportation Board, the district court held a bench trial and ruled in favor of Iowa Northern. It found that the project was preempted by the Interstate Commerce Commission Termination Act of 1995 (the "Act"), concluding that boring through the embankment created a risk of instability that "would affect operation of trains on the track" and potentially bring Iowa Northern's operations to a standstill. 49 U.S.C. § 10501(b). The district court issued a writ of mandamus enjoining the drainage district from proceeding. We transferred the drainage district's appeal to the court of appeals, which affirmed the district court's ruling. We granted the drainage district's application for further review.

II.

Enacted in 1995, the Act abolished the Interstate Commerce Commission, the agency previously responsible for oversight of the railroad industry, and replaced it with the Surface Transportation Board. *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 102 (2d Cir. 2009). The Act grants the transportation board "exclusive" jurisdiction over "transportation by rail carriers" and "construction" or "operation" of rail tracks or "facilities." 49 U.S.C. § 10501(b). The Act also includes an express preemption clause, specifying that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.* § 10501(b)(2). The term "transportation" is defined broadly to include a "property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail." *Id.* § 10102(9)(A).

Iowa law grants drainage districts the power to compel a railroad company to make improvements to enable drainage across a railroad's right-of-way. Iowa Code §§ 468.109, .110. This grant includes the power to direct the railroad to "rebuild and reconstruct the necessary culvert or bridge where any ditch, drain, or watercourse crosses its right-of-way, so as not to obstruct, impede, or interfere with the free flow of the water." *Id.* § 468.109. Should a railway refuse to construct the drainage district's proposed improvement, state law authorizes the drainage district to construct the improvement and assess the costs to the railway. *See id.* § 468.112.

Iowa Northern argues that the writ of mandamus is warranted under two theories of express preemption. First, Iowa Northern asserts that § 468.109 is "categorically preempted" by the Act because it denies the railway the ability to conduct operations or activities authorized by the transportation board in direct conflict with exclusive federal regulation of railroads. Second, it argues that the claims are preempted as applied under the test we used in *Griffioen v. Cedar Rapids & Iowa City Ry.*, 914 N.W.2d 273, 285 (Iowa 2018). The district court agreed with Iowa Northern, concluding that the Act preempted the drainage district's authority under both theories.

In addressing the preemptive reach of the Act, the transportation board has noted two broad categories of state and local actions subject to categorical preemption. The first category includes "any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized." *Emerson v. Kansas City S. Ry.*, 503 F.3d 1126, 1130 (10th Cir. 2007) (quoting *CSX Transp., Inc.—Petition for Declaratory Ord.*, STB Finance Docket No. 34662, 2005 WL 1024490, at *2 (S.T.B. May 3, 2005)). The drainage

laws at issue here, however, do not fall into this category. Requiring a railroad to install a drainage pipe beneath its rail line does not subject the railroad to a "permitting or preclearance" requirement that denies the railroad the opportunity to operate. *See, e.g.*, *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1030–31 (9th Cir. 1998) (concluding that the Act preempted a local environmental-permitting requirement that sought to prevent a railroad from pursuing various rail improvement projects); *Soo Line R.R. v. City of Minneapolis*, 38 F. Supp. 2d 1096, 1101 (D. Minn. 1998) (concluding that the Act preempted a local demolition-permitting process that prevented a railroad from demolishing several of its buildings).

The second category pertains to "state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service." *Emerson*, 503 F.3d at 1130 (citations omitted) (quoting *CSX Transp.*, 2005 WL 1024490, at *2). But this category is likewise inapplicable because the transportation board does not directly regulate the construction of drainage pipes beneath rail lines that do not interfere with the railroad's operation. *See, e.g.*, *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 288 F. Supp. 3d 565, 597 (E.D. Pa. 2017) (stating that an action to compel a railroad to install a drainage pipe was not preempted in the absence of evidence that it would interfere with railroad operations), *aff'd*, 777 F. App'x 43 (3d Cir. 2019). As a result, we conclude that the Act does not categorically preempt the state drainage laws at issue here.

State law actions can nonetheless be preempted if they unreasonably burden or interfere with rail transportation. *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1143 (8th Cir. 2015). In *Griffioen*, we considered whether the Act

preempted various landowners' state-law tort claims against four defendant railroad companies following the June 2008 floods in Cedar Rapids. 914 N.W.2d at 277. The tort action alleged that on June 10, 2008, the defendants, owners of four railroad bridges that cross the Cedar River, "parked railcars laden with rocks on their bridges to weigh down the bridges in an effort to keep them from washing away during the flooding." *Id.* at 278–79. Two of the defendants' four bridges collapsed. *Id.* at 279. The plaintiffs alleged that "[t]he fallen railcars clogged the Cedar River and therefore caused or exacerbated the damage to plaintiffs' property," and that "[t]he two bridges that did not collapse also caused damage when the rising water reached the railcars atop the bridges, creating a dam effect and diverting water to low-lying areas." *Id.*

In analyzing whether the tort claims were preempted, we applied the Fifth Circuit's test from *Franks Investment Co. v. Union Pacific Railroad*, 593 F.3d 404, 410 (5th Cir. 2010) (en banc). *Griffioen*, 914 N.W.2d at 285–87; *see also Tubbs*, 812 F.3d at 1144–45 (employing the *Franks* test and listing other federal circuits that have applied the same test). Under the *Franks* test, preemption applies "only [to] laws that have the effect of managing or governing rail transportation." *Franks Investment Co.*, 593 F.3d at 410. But a state action does not manage or govern rail transportation if it has merely "an incidental effect on railroad transportation." *Id.* In *Griffioen*, we concluded that the tort claims against the railroads, which imposed duties on "where and when railroads placed their railcars on their transportation lines or how they constructed those lines," constituted more than "[i]ncidental burdens on transportation." 914 N.W.2d at 286–87. We thus held that under the *Franks* test, the Act preempted the landowners' claims.

But this case bears little resemblance to *Griffioen.* In *Griffioen,* the property owners' tort claims sought to impose liability for operational decisions made by railroads to preserve their rail lines during an emergency. *Id.* at 279. In this case, the issue is whether the drainage district's efforts to replace and modernize a single culvert unreasonably burden Iowa Northern by imposing more than incidental effects on its operations.

Whether an action unreasonably burdens or interferes with rail transportation is a fact-intensive analysis. *Tubbs,* 812 F.3d at 1144. As the proponent of the preemption defense, the railroad bears the burden to show that the drainage district's proposed action creates an unreasonable burden. *Emerson,* 503 F.3d at 1133. Because mandamus actions are in equity, our review is de novo. *Fitzgarrald v. City of Iowa City,* 492 N.W.2d 659, 663 (Iowa 1992) (en banc). In equity cases, although we give weight to the district court's factual findings, especially as to witness credibility, we are not bound by them. Iowa R. App. P. 6.904(3)(*g*).

We turn to the witness testimony, beginning with Peter Schierloh, one of Iowa Northern's bridge engineers, who testified about his safety concerns with the proposed installation. He asserted that the existing stone culvert, which he estimated as having been built in the 1870s, remained functional and stable. He opined that installing a new steel culvert near the existing culvert was "inherently unsafe" for reasons having to do with the existing culvert's stones. Because the stones' unfinished sides were likely jagged and irregular in shape, Schierloh asserted that they might jut deeper than expected into the surrounding embankment. He feared that the boring equipment could strike the irregular backside of the stone culvert, leading to a compromise or collapse of the culvert and the tracks above it. Schierloh said that using laser surveying tools to alert

to even a quarter-inch movement in the rail line would provide insufficient comfort.

Iowa Northern's former vice-president and general counsel, Scott Bannister, also testified. Bannister asserted Iowa Northern's position that allowing any trains to operate over the site during the jack-and-bore construction would be inherently unsafe. As support for this contention, Bannister referenced a 2017 derailment near Plainfield, Illinois, caused by a jack-and-bore culvert installation. The construction caused a rail line to collapse and resulted in upwards of a $12 million loss. According to Bannister, fear of a similar outcome during the three-to-seven days the proposed installation could last led Iowa Northern to declare "that we can't and will not allow any train traffic."

The drainage district offered testimony from Matthew Reinsdorfer, a geotechnical engineer. Reinsdorfer conducted a subsurface investigation of the embankment using soil-boring tests and ground-penetrating radar. These tests were intended to address Schierloh's concerns about the new culvert's proximity to the existing culvert. One of the borings, which was drilled close to the culvert, made contact with the culvert about sixteen feet down. Two other borings, drilled slightly farther away, ultimately hit bedrock without contacting the culvert.

Another witness, Kent Rode, a drainage engineer with a private engineering firm, testified about how the existing culvert sat too high to adequately drain the surface and tile water. Rode, who estimated having handled 300–400 projects for drainage districts in his career, described how the new steel culvert would sit at a lower elevation than the stone culvert to enable better water flow. Although Reinsdorfer's testing revealed no problems at the original location, in response to Schierloh's concerns about construction near the existing culvert,

Rode said that the new culvert would be moved an additional four feet farther away from the existing culvert as an added measure of safety.

Finally, the drainage district offered the testimony of Scott Dullard, a trenchless-construction expert whose company, The Driller, LLC, specializes in jack-and-bore installations and had previously bid on the project. Dullard testified that The Driller had employed the jack-and-bore method about 6,500 times—with the majority of those involving installations under rail lines—without an incident of embankment failure or traffic interruption. Dullard's testimony that his company "ha[s] never fouled a railroad track" went unrebutted.

Dullard further testified that his company was a preferred contractor for several large railways, including Union Pacific, Canadian National, and Burlington Northern. Dullard noted that not only was Iowa Northern familiar with the jack-and-bore method from prior projects but also that Iowa Northern had created its own "standard specifications for boring and jacking casing pipe" for its trenchless-construction contractors to abide by. Dullard testified that his company would comply with the specifications.

Dullard offered observations about the Plainfield derailment on which Iowa Northern premised much of its concern. Based on Dullard's review of the derailment report, the incident was caused by "total incompetence." According to Dullard, instead of keeping the auger within the casing of the pipe, the construction contractor inexplicably allowed the auger to advance 105 feet ahead of the casing, thus boring a hole without any reinforcement to prevent the hole from caving in. He testified that this problem is easily avoided by simply keeping the auger within the casing as prescribed, particularly when boring through clay or sand fill. Dullard also described additional safety measures his company

employs during construction, such as using a flagger to notify workers of an approaching train and temporarily halting work until the train passes.

As to the location of the steel culvert's installation, Dullard testified that moving the installation four feet farther away from the existing culvert presents no problem. He testified to possessing "a lot more information about this project at this point than we typically do," and he referred to the soil borings and ground-penetrating radar as informational "gold." He noted that his company had previously bid on the job and would be willing to take it on.

Based on the evidence presented at trial, in our de novo review, we conclude that the project presents only "incidental" effects on rail transportation insufficient to trigger preemption under the Act. *Griffioen*, 914 N.W.2d at 285. The evidence shows that the jack-and-bore method is the industry standard for installing utilities under active roadways and railways precisely because it does *not* affect surface traffic.

While some risk of interference at the surface is inherent in any jack-and-bore pipeline installation, the likelihood that Iowa Northern's rail transportation would be affected by the installation here appears vanishingly small. In our view, Iowa Northern's claims about the safety risk unnecessarily catastrophize what the evidence suggests is a rather common construction practice. In response to Dullard's unrebutted testimony about his company's many thousands of projects using the jack-and-bore method without incident, Iowa Northern offers only a single instance (the Plainfield derailment) of a botched installation. But as Dullard explained, the mistakes that gave rise to that incident are readily avoidable. And as an added measure, safeguards such as track monitoring and immediate stop-work orders for minute deflections further mitigate safety risks.

Iowa Northern argues that whether the installation will in fact damage the structural integrity of the tracks is a moot point because the railway "will not run its trains if the jack and bore steel culvert installation proceeds." Both the district court and the court of appeals embraced this argument. The district court's interference finding relied in part on Iowa Northern's statement that "it would not allow any operation on the line during this construction." The court of appeals similarly elaborated that "because the record shows that Iowa Northern will not allow any trains to operate during construction due to its impact on track stability and the safety risks inherent with it, the action relates to railroad transportation." But a railroad can't manufacture a claim of preemption by voluntarily choosing to halt operations in response to a proposed drainage improvement project. If the project can be performed safely—as the expert testimony regarding the 6,500 successful installations suggests—then Iowa Northern's decision to stop trains is a business choice, not a necessity imposed by the drainage district's action. To hold otherwise runs the risk of allowing railroads to veto any state infrastructure project simply by declaring a refusal to operate near it.

Further, the district court criticized the drainage district's revised proposal to install the steel culvert four feet farther away from the existing culvert, characterizing the plan as "a moving target." But this criticism, in our view, misses the larger point. Iowa Northern's writ of mandamus is not premised on project notice rights but on the alleged interference it claims the installation will cause. We view the drainage district's willingness to modify the plan to address Iowa Northern's concerns as a positive, safety-enhancing development.

As other courts have articulated, the Act doesn't preempt every state regulation that affects a railroad. "[S]tates and towns may exercise traditional

police powers over the development of railroad property, at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions." *Emerson*, 503 F.3d at 1133 (alteration in original) (quoting *Green Mountain R.R. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005)). We conclude that this case presents such an instance. On the record before us, Iowa Northern has failed to meet its burden to show that the Act preempts the authority granted to the drainage district at issue here.

"Routine crossing disputes are *not* typically preempted." *New Orleans & Gulf Coast Ry. v. Barrois*, 533 F.3d 321, 332–33 (5th Cir. 2008). As the transportation board has explained, "[R]outine, non-conflicting uses, such as non-exclusive easements for at-grade road crossings, wire crossings, sewer crossings, etc., are not preempted so long as they would not impede rail operations or pose undue safety risks." *Id.* at 333 (alteration in original) (quoting *Maumee & W. R.R.—Petition for Declaratory Ord.*, STB Finance Docket No. 34354, 2004 WL 395835, at *2 (S.T.B. Mar. 3, 2004)). As a result, these types of cases "are typically resolved in state courts." *Id.* We view this as a relatively routine crossing case. If a railroad could block the replacement of a failing drainage culvert under a rail line simply by invoking the possibility that trains would have to stop during brief periods of construction or the fact that an accident occurred in Illinois under different circumstances some years back, the unreasonable burden would be on farming—not railroading.

III.

Because the record fails to establish that the project would constitute more than an incidental interference with Iowa Northern's operation, the Act does not

preempt the drainage district's action. The court of appeals decision is thus vacated, the district court's judgment is reversed, and the case is remanded for entry of judgment in favor of the defendants and the dissolution of the writ of mandamus.

**Decision of Court of Appeals Vacated; District Court Judgment Reversed and Case Remanded.**