PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1934
_____

MD MALL ASSOCIATES, LLC
Trading as MacDade Mall Associates, L.P.,
Appellant

v.

CSX TRANSPORTATION , INC.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-11-cv-04068)
District Judge: Hon. Juan R. Sanchez
_____

Argued
January 8, 2013

Before: RENDELL, FISHER, and JORDAN, *Circuit
Judges*.

(Filed: April 30, 2013)
_____

Marc B. Kaplin   [ARGUED]
Pamela M. Tobin
Kaplin, Stewart, Meloff, Reiter & Stein
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA   19422
        *Counsel for Appellant*

Richard P. Caldarone
Andrew Tauber   [ARGUED]
Mayer Brown
1999 K Street, NW
Washington, DC   20006

Heather M. Gamache
John E. Young, IV
Flynn & Wirkus
1500 John F. Kennedy Blvd. - #312
Philadelphia, PA   19102
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

MD Mall Associates, L.L.C. ("MD Mall"), appeals from the summary judgment entered against it by the United States District Court for the Eastern District of Pennsylvania on MD Mall's claims that CSX Transportation, Inc. ("CSX"), a railroad, is liable for storm water flooding MD Mall's

property. For the reasons that follow, we will vacate the District Court's grant of summary judgment, and remand for further proceedings consistent with this opinion.

## I. Background[1]

### A. *The Runoff Problem*

MD Mall owns and operates the MacDade Mall (the "Mall") located in Delaware County, Pennsylvania. The Mall is bounded on the south by a single railroad track owned by CSX, and, interestingly enough, on the east by South Avenue. CSX's property consists of the track and two drainage ditches, one running along either side of the track. Houses located to the south of the track are at a higher elevation than the track, and the track is at a higher elevation than the Mall. CSX's predecessor in interest designed and installed an earthen berm on the north side of the track to prevent storm water from flowing downhill onto the property occupied by the Mall. The berm straddles the property line of the Mall and the railroad, with the north side of it sloping down into the parking lot. The Mall claims ownership of that slope up to the crest of the berm.

---

[1] In accordance with our standard of review, *see infra* note 6, we set forth the facts in the light most favorable to MD Mall. *See Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 257 (3d Cir. 2012) ("When reviewing a grant of summary judgment the court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." (internal quotation marks omitted)).

For many years after being built, the berm prevented storm water from discharging onto MD Mall's property. In October 2010, however, storm water breached the berm at a spot near South Avenue, allowing water runoff and debris from CSX's property to flow down the slope and overwhelm a private storm water inlet located in the Mall parking lot. An MD Mall representative sent two letters, dated October 29, 2010, and January 13, 2011, asking CSX to contact him to discuss a resolution to the runoff problem. In response, CSX's road master responsible for that portion of the track inspected the site. Based on the road master's findings, a CSX engineer wrote in an internal memorandum that, "[i]nstead of the water flowing over the crossing [at South Avenue] and down the road towards the storm drains, it is not reaching the crossing and [is] instead running towards the [Mall] property." (App. at 56.) The engineer proposed that CSX dig a "[d]itch" on CSX property "along the area and block the hill leading to the property, allowing the water to flow into the road and down to [a public] storm drain." (App. at 56.) He also raised the possibility of installing a culvert under South Avenue to send the water to a nearby stream. In an email dated January 20, 2011, the engineer notified MD Mall that CSX intended to implement the first option, which was less costly, and that it would complete the project "in a timely fashion." (App. at 57.)

Despite that assurance, CSX did not go forward with that plan. Instead, it began constructing a concrete spillway on the Mall's side of the berm to direct CSX's storm water into the Mall's private drainage inlet. CSX workers cleared out a channel on the berm and set up wooden forms to create the spillway, all of which MD Mall asserts was done without its consent, while CSX claims that MD Mall had consented to

4

the installation in order to stop mud and debris from entering the Mall property.

Whether or not there had been consent, when the Mall's manager discovered what CSX was doing, he immediately halted the work, demanding that the wooden forms be removed and that the Mall's side of the berm be restored to its original grade. CSX agreed to halt construction of the spillway, but requested permission to install riprap in the cleared out channel. MD Mall granted consent in writing but insisted that CSX provide a permanent solution to the runoff problem. When CSX was not forthcoming with a permanent solution, MD Mall filed the present suit, invoking diversity jurisdiction in the District Court.

B.    *Procedural History*

MD Mall brought claims of negligence (Count I) and continuing storm water trespass (Count II) against CSX for "failing to properly maintain CSX's property so as to prevent water on CSX's property from flowing over onto [MD Mall's] property and causing damage … ."[2]  (App. at 122.) Although it initially sought "compensatory and consequential damages … , together with prejudgment interest and costs" (App. at 123), MD Mall later dropped its demand for

---

[2] MD Mall also brought a separate trespass claim (Count III) against CSX for entering the Mall's property without permission to build the concrete spillway on the Mall's side of the berm. After the District Court granted summary judgment to CSX on Counts I and II but denied summary judgment on Count III, MD Mall withdrew Count III.

5

damages and sought only injunctive relief that would require CSX to remedy the runoff problem.

Both parties moved for summary judgment. MD Mall had learned during discovery that, in March 2009, CSX had refurbished the relevant portion of the track, deploying approximately 30 pieces of heavy equipment to replace 325 railroad ties. Based on that information, MD Mall argued in its motion for summary judgment that the "substantial modifications to the tracks' drainage system" in 2009 "led to the discharge of CSX's water run-off onto the Mall Property and the noticeably deep property erosion by fall 2010." (Supplemental App. at 80.) For support, MD Mall cited the deposition testimony of its expert, Dr. Frank X. Browne, who identified the source of the water problem as CSX's 2009 alteration of the drainage system and the hydrological condition of the property. MD Mall also asserted that, for five years, CSX had failed to clear out the ditch adjacent to the berm.

The fact that storm water had discharged from CSX's property onto MD Mall's property was evidence, according to MD Mall, that CSX had violated a federal regulation enacted pursuant to the Federal Railroad Safety Act (the "FRSA" or the "Act"), which "require[s] that CSX manage and control the stormwater occurring on its property." (Supplemental App. at 90.) That regulation provides that "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." 49 C.F.R. 213.33. MD Mall argued that § 213.33 imposed on CSX a duty to ensure that the earthen berm system that was designed to prevent water from flowing onto the Mall

property is properly maintained. (Supplemental App. at 90.) Given the erosion of the berm and the consequent flooding, MD Mall continued, "CSX is clearly not accommodating the expected water flow from its property, as required under Section 213.33."[3] (Supplemental App. at 90.) As relief, MD Mall requested that "CSX be ordered to control and manage the water run-off occurring on its property pursuant to a full engineering plan." (Supplemental App. at 91.)

Despite invoking § 213.33, MD Mall asserted that its claims were not preempted by the FRSA, even though that Act expressly provides that "[a] state may adopt or continue in force a law, regulation, or order related to railroad safety … until the Secretary of Transportation (with respect to railroad safety matters) … prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). In support of its position, MD Mall cited a 2007 amendment to that preemption provision, which serves as a "[c]larification regarding State law causes of action." 49 U.S.C. § 20106 (the "Clarification Amendment" or the "Amendment"). The Clarification Amendment provides that "[n]othing in [the FRSA] shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party … has failed to comply with the Federal standard of care established by a regulation or order issued by the

---

[3] *See also* MD Mall's Supplemental Mem. in Opp'n to CSX's Motion for Summ. J. at 6 (arguing that the "clear mandate" of § 213.33 is that CSX must "manage the stormwater on its property so that it is not discharged on to the Mall property in a concentrated and increased way").

7

Secretary of Transportation." *Id.* MD Mall argued that, under the Amendment, its claims were not preempted.

The District Court saw things differently. It granted CSX's cross-motion for summary judgment, holding that MD Mall's claims were blocked by the express preemption provision of the FRSA. Because MD Mall had asserted that CSX was in violation of § 213.33, the District Court held that MD Mall had "implicitly acknowledge[d]" that the regulation is applicable to its claims (App. at 7), and the Court then determined that the claims were preempted.[4]

The District Court rejected MD Mall's argument that its negligence and continuing storm water trespass claims were subject to the Clarification Amendment. While state law actions are permitted to proceed when they allege a failure to comply with a federal standard of care, the Court held that the Amendment is limited to cases "'seeking *damages* for personal injury, death, or property damage.'" (App. at 8 (quoting 49 U.S.C. § 20106(b)(1)).) Because MD Mall "appears to have disavowed any claim for damages and is instead seeking only equitable relief," the Court determined that the Amendment did not apply.[5] (App. at 8.)

---

[4] The District Court mentioned that another regulation, 49 C.F.R. § 213.103, relates to MD Mall's claims. Section 213.103 requires railroad tracks to be supported by material that will, among other things, "[p]rovide adequate drainage for the track." *Id.* § 213.103(c).

[5] Because the District Court concluded that MD Mall's claims were preempted by the FRSA, it declined to address CSX's alternative argument that the claims were preempted by the Interstate Commerce Commission Termination Act

MD Mall then filed this timely appeal.

## II. Discussion[6]

### A. *Waiver and Judicial Estoppel*

MD Mall has now discarded its previous position that § 213.33 sets the pertinent standard for measuring CSX's liability. It argues instead that the regulation "[does] not even relate to, let alone cover, a railroad's discharge of stormwater onto an adjoining property." (MD Mall's Opening Br. at 11.) Because MD Mall raises that argument for the first time on appeal, CSX asserts that we should not consider it, as MD

---

(the "ICCTA"). It also declined to evaluate the underlying substantive merits of MD Mall's state law negligence and storm water trespass claims.

[6] The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291. We "review [the] District Court's grant of summary judgment *de novo*, applying the same standard the District Court applied." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 257 (3d Cir. 2012) (internal quotation marks omitted). Summary judgment is proper only where the pleadings, discovery, and non-conclusory affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(c). As earlier noted, *supra* note 1, when reviewing a grant of summary judgment we "must view the facts in the light most favorable to the nonmoving party," in this case MD Mall, "and draw all inferences in that party's favor." *Gonzalez*, 678 F.3d at 257 (internal quotation marks omitted).

Mall either waived it or is judicially estopped from raising it now. We thus begin by addressing waiver and estoppel.

### 1. *Waiver*

Arguments that are "asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review … absent exceptional circumstances." *Birdman v. Office of the Governor*, 677 F.3d 167, 173 (3d Cir. 2012) (internal quotation marks omitted). However, "[w]hile waiver ordinarily bars raising new arguments for the first time on appeal, this rule is one of discretion rather than jurisdiction, and it may be relaxed whenever the public interest so warrants." *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 834-35 (3d Cir. 2011) (alteration, citations, and internal quotation marks omitted); *see also Webb v. City of Phila.*, 562 F.3d 256, 263 (3d Cir. 2009) (waiver rule may be relaxed "where the issue's resolution is of public importance" (internal quotation marks omitted)). CSX acknowledges that this case is of public importance; it argues that MD Mall's claims, if allowed, could subject it and other railroads to similar claims by myriad other landowners with property near railroad tracks. Conversely, if MD Mall's claims are preempted, property owners may have no remedy for the discharge of storm water onto their land by a neighboring railroad. Either way, MD Mall's claims are of public importance, and we accordingly decline to apply the general rule of waiver in this case.

### 2. *Judicial Estoppel*

CSX also contends that MD Mall is judicially estopped from claiming that § 213.33 does not cover its claims.

"Judicial estoppel is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that [it] has previously asserted in the same or in a previous proceeding." *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 272 (3d Cir. 2012) (internal quotation marks omitted). "The doctrine exists to protect the integrity of the judicial process and to prohibit parties from deliberately changing positions according to the exigencies of the moment." *Id.* (internal quotation marks omitted). That said, "we have consistently stated that the doctrine should only be applied to avoid a miscarriage of justice." *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003).

"[T]hree factors inform a federal court's decision whether to apply" judicial estoppel: "there must be (1) irreconcilably inconsistent positions; (2) adopted in bad faith; and (3) a showing that estoppel addresses the harm and no lesser sanction is sufficient." *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) (alterations and internal quotation marks omitted). However, "judicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position." *Id.* CSX insists that MD Mall did convince the Court to accept its earlier position, because "the court *did* accept the Mall's 'implicit[] acknowledg[ment]' that 'the drainage regulation 'covers' the subject of drainage' in the areas implicated by this case." (CSX's Br. at 22 (quoting App. at 7).)

As MD Mall correctly points out, however, the District Court's citation of MD Mall's acknowledgment that § 213.33 covers its claims does not rise to the level of reliance

11

necessary to trigger judicial estoppel. Before determining that judicial estoppel bars relief, "courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks omitted). Because judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase," *id.* at 749 (internal quotation marks omitted), "[a]bsent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations and thus poses little threat to judicial integrity," *id.* at 750-51 (citation and internal quotation marks omitted).

Judicial estoppel thus does not apply here because MD Mall did not obtain a benefit from the arguments it made in the District Court. The arguments it made did not prevail in any meaningful sense. The District Court instead granted summary judgment to CSX. In the decisions that CSX cites to support its judicial estoppel argument, by contrast, judicial estoppel was found to bar relief because each estopped party had obtained an unfair litigation benefit as a result of its prior contradictory position. *See New Hampshire*, 532 U.S. at 751-52 (state barred from changing the location of a boundary to which it had agreed in a prior consent order approved by the court); *Macfarlan*, 675 F.3d at 273-74 (plaintiff barred from seeking reinstatement to his former job when he had accepted disability benefits based on a purported inability to work); *Krystal*, 337 F.3d at 320 (debtor estopped from asserting claim which he failed reveal to creditors so as to keep the

12

recovery on the claim for himself).  The doctrine of judicial estoppel "should only be applied to avoid a miscarriage of justice." *Krystal*, 337 F.3d at 319.  In this case, MD Mall did not benefit from its inconsistent position in the District Court, and no miscarriage of justice would result from our entertaining the argument it now advances on appeal.  Thus, while we have no desire to encourage the kind of head-snapping inconsistency manifested in MD Mall's arguments, we decline to treat its new argument as judicially estopped.

### B.     *Express Preemption Under the FRSA*

As already noted, the FRSA provides that a state "law, regulation, or order related to railroad safety" shall be preempted by a regulation or order issued by "the Secretary of Transportation (with respect to railroad safety matters)" that "cover[s] the subject matter of the State requirement."  49 U.S.C. § 20106(a)(2).  Pursuant to the previously described 2007 Clarification Amendment to that express preemption provision, even though a federal regulation "covers" a state law related to railroad safety, a plaintiff may still bring claims "seeking damages for personal injury, death, or property damage" when the plaintiff "alleg[es] that a party … has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation." *Id.* § 20106(b)(A) (2007).

In *Zimmerman v. Norfolk Southern Corp.*, 706 F.3d 170 (3d Cir. 2013), we explained that, under the Clarification Amendment, "claimants can avoid preemption by alleging a violation of either a 'Federal standard of care' or the railroad's 'own plan, rule, or standard that it created pursuant to a regulation or order.'"  *Id.* at 177 (quoting 49 U.S.C.

13

§ 20106(b)(1)(A)-(B)). The Amendment "restricts preemption in some respects," *id.*, by clarifying that a claim is permitted when the allegation is that the railroad did not comply with the standard established by a federal regulation (traveling at 90 m.p.h, for example, despite a regulation limiting train speeds to 60 m.p.h.), "even when [the] regulation covers the subject matter of [the] claim," *id.* The Clarification Amendment also "preserves cases interpreting the phrase 'covering the subject matter of the State requirement,'" so that the well-developed law indulging a presumption against preemption, as further described herein, remains intact. *Id.* (quoting 49 U.S.C. § 20106(a)(2)).

*Zimmerman* calls for us to follow a two-step process: "We first ask whether the defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation." *Id.* at 178. If so, as was the case in *Zimmerman*, "the plaintiff's claim avoids preemption." *Id.* (citing 49 U.S.C. § 20106(b)(1)(A)-(B)). If not, we ask the second question, which is "whether any federal regulation covers the plaintiff's claim." *Id.* (citing 49 U.S.C. § 20106(a)(2)).[7]

---

[7] The universe of possible claims can be thought of as fitting within three categories: first, those, like the ones in *Zimmerman*, that depend upon the breach of a standard set by federal law (or adopted by a railroad from federal law) as the basis of liability and are thus not preempted; second, those that depend on state law as the basis for liability but which are preempted because there is an applicable FRSA regulation that entirely covers the plaintiff's claim; and, third, those that depend on state law and are not preempted because there is no such regulation. The first *Zimmerman* question seeks to

14

This case is different from *Zimmerman* in that, on appeal, MD Mall has abandoned the argument that CSX violated a federal standard of care and instead insists that the pertinent federal regulation, § 213.33, does not cover a storm water discharge dispute of the type before us now. (MD Mall's Opening Br. at 11.) Thus, MD Mall's claims are only preserved from preemption if no federal regulation enacted pursuant to the FRSA "cover[s] the subject matter [*i.e.* storm water runoff] of the State requirement." 49 U.S.C. § 20106(a)(2).[8]

discover which claims fall within the first category, and the second *Zimmerman* question brings to light the claims that fall within the latter two categories.

[8] Although MD Mall has abandoned its argument under the Clarification Amendment and we therefore need not evaluate whether the Amendment applies here, it did argue in the District Court, as already described, that § 213.33 "require[s] that CSX manage and control the stormwater occurring on its property" (Supplemental App. at 90), and that CSX breached that duty through negligence during the 2009 track refurbishment. It said that it was therefore authorized to bring suit under the Clarification Amendment. The District Court held, however, that the Clarification Amendment only saves from preemption state law actions that "seek[] damages for personal injury, death, or property damage." 49 U.S.C. § 20106(b)(1). The Court read the Amendment's silence on equitable relief as precluding MD Mall's request for an injunction. That conclusion is open to question.

The Clarification Amendment was a pinpoint piece of legislation meant to overturn federal court decisions in the so-called "Minot Derailment Cases." Those cases, which

involved the horrifying derailment near Minot, North Dakota, of tank cars carrying toxic chemicals, interpreted the FRSA to preempt claims for damages, even when a plaintiff alleged that a railroad violated federal regulations or its own internal rules. *See Lundeen v. Canadian Pac. Ry. Co.*, 507 F. Supp. 2d 1006, 1009 (D. Minn. 2007); *Mehl v. Canadian Pac. Ry., Ltd.*, 417 F. Supp. 2d 1104, 1106 (D.N.D. 2006). According to its legislative history, the Amendment was intended to "clarify the intent and interpretations of the existing preemption statute and to rectify the Federal court decisions related to the Minot, North Dakota accident that are in *conflict with precedent*." H.R. Rep. No. 110-259, at 351, 120 Cong. Rec. H8589 (2007), U.S. Code Cong. & Admin. News 2007, p. 119 (emphasis added). To further hammer home its dissatisfaction with the Minot Derailment Cases, Congress applied the Amendment to "all pending State law causes of action arising from activities or events occurring on or after January 18, 2002," the exact date of the Minot derailment. *Id.*; *see also Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1214 (10th Cir. 2008) (noting that Congress enacted the Amendment to rectify Minot Derailment Cases); *Kurns v. Chesterton*, No. 08-2216, 2009 WL 249769, at *5 (E.D. Pa. Feb. 3, 2009) ("[T]he amendments were clearly directed at the Minot, North Dakota, train derailment occurring on January 18, 2002.").

Aimed as it was at the specific difficulty Congress perceived in the Minot Derailment Cases, the Clarification Amendment speaks only about claims for damages, but that does not mean that suits for injunctive relief are beyond its clarifying effect. Congress used the word "clarification," which "indicates [it] sought to resolve an ambiguity rather than effect a substantive change" in railroad liability under

16

When interpreting the FRSA's preemption provisions, we apply a general "presumption against preemption." *Bruesewitz,* 561 F.3d at 240. "In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005) (internal quotation marks omitted). "The presumption is relevant even when there is an express pre-emption clause. That is because 'when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption.' Thus, the presumption operates both to prevent and to limit preemption." *Franks Inv. Co. v. Union Pacific R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)) (internal quotation marks omitted); *see also N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007) ("[A] federal law does not preempt state laws where the activity regulated by the state is merely a peripheral concern of the federal law … ." (alteration and internal quotation marks omitted)). In the end, preemption applies only if it "is the

_____

the FRSA. *Henning*, 530 F.3d at 1216. Accordingly, the Clarification Amendment indicates that "a state law cause of action is not preempted when it is based on an allegation that a party failed to comply with a federal standard of care established by regulation or failed to comply with its own plan, rule or standard created pursuant to a federal regulation." *Gauthier v. Union Pac. R.R. Co.*, 644 F. Supp. 2d 824, 835 (E.D. Tex. 2009). A reading of the Clarification Amendment that leaves claims for injunctive relief preempted is not something we need to address now, but we note some difficulty with the District Court's reasoning.

clear and manifest purpose of Congress" in enacting the law in question, *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (internal quotation marks omitted), because "the purpose of Congress is the ultimate touchstone in every pre-emption case," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotation marks omitted).

Beyond those general principles, the Supreme Court has determined that the FRSA's preemption provision "displays considerable solicitude for state law." *Easterwood*, 507 U.S. at 665. For example, Congress enacted the FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents," 49 U.S.C. § 20101, and the Secretary of Transportation has authority to "prescribe regulations and issue orders for every area of railroad safety," *id.* § 20103(a), but the preemptive effect of the statute reaches only state laws "covered" by the statute's implementing regulations. *Id.* § 20106(a)(2). Because the term "cover" is a "restrictive term," preemption will not apply if the FRSA regulation in question merely "touch[es] upon or relate[s] to" the subject matter of state law. *Easterwood*, 507 U.S. at 664 (internal quotation marks omitted). Rather, "pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id.*

We accordingly held in *Strozyk v. Norfolk Southern Corp.*, 358 F.3d 268 (3d Cir. 2004), that a regulation's "bare mention of … limited visibility … does not indicate an intent to regulate [that] condition[]," and that a suit against a railroad alleging a condition of poor visibility at a railroad crossing was not preempted. *Id.* at 273. Other courts have likewise concluded that a federal regulation dictating that "[v]egetation on railroad property which is on or immediately

18

adjacent to [the] roadbed shall be controlled so that it does not … [o]bstruct visibility of railroad signs and signals," 49 C.F.R. § 213.37(b), serves to "preempt[] any state-law claim regarding vegetative growth that blocks a sign immediately adjacent to a crossing, but it does not impose a broader duty [under federal law] to control vegetation so that it does not obstruct a motorist's visibility of oncoming trains." *Shanklin v. Norfolk S. Ry. Co.*, 369 F.3d 978, 987 (6th Cir. 2004) (internal quotation marks omitted). Thus a state law claim is not preempted if it alleges negligence in allowing vegetation to obscure safe lines of sight at a railroad crossing. *See, e.g.*, *Peters v. Union Pac. R.R. Co.*, 455 F. Supp. 2d 998, 1003 (W.D. Mo. 2006) (vegetation in crossing and right-of-way were not areas on or immediately adjacent to tracks and therefore claims that they obstructed sight lines were not preempted under the FRSA); *Murrell v. Union Pac. R.R. Co.*, 544 F. Supp. 2d 1138, 1154 (D. Or. 2008) (claims for failing to provide adequate visibility not preempted under the FRSA); *Anderson v. Wis. Cent. Transp. Co.*, 327 F. Supp. 2d 969, 979-80 (E.D. Wis. 2004) (claims of vegetation beyond the roadbed or immediately adjacent to it not preempted); *cf. Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 516 (5th Cir. 1999) (sound capacity safety regulation addresses only the sound-producing capacity of the whistles and does not substantially subsume regulations on when whistles are sounded); *Bradford v. Union Pac. R.R. Co.*, 491 F. Supp. 2d 831, 838-39 (W.D. Ark. 2007) (failure to keep proper lookout and crew fatigue not preempted because regulations merely touched upon the subject and did not subsume them).

CSX argues that § 213.33, which by its terms requires that a railroad's drainage facilities "under or immediately adjacent to" the track "be maintained and kept free of

19

obstruction," 49 C.F.R. § 213.33, preempts Pennsylvania law governing storm water runoff. As the railroad sees it, MD Mall's claims must be dismissed because § 213.33 "cover[s] the subject of drainage under and around the tracks – and therefore preempt[s] the Mall's claims, which concern precisely the same topic."[9] (CSX's Br. at 18.) Although it has acknowledged that the limited purpose of § 213.33 "is to keep water away from the tracks, that's it" (Supplemental App. at 133), CSX has nevertheless taken the aggressive position that the railroad is thereby permitted to channel its rainwater onto a neighboring property. (*See, e.g.*, Supplemental App. at 131 ("The railroad can do whatever it needs to do to keep water away … ."); *id.* at 133 ("[Section 213.33] doesn't say, you can't put it on your – your neighbor's land, it doesn't say anything, it just says, keep it away from the tracks.").

We reject that conclusion. First, to the extent CSX is saying that, as long as a regulation involves the same general topic as a plaintiff's claim, such as water drainage, the regulation "covers" that claim, the argument is at odds with Supreme Court precedent. A regulation must do more than "touch upon or relate to [the] subject matter" of a state law

---

[9] CSX also asserts that 49 C.F.R. § 213.103(c), which requires railroads to use ballast that "[p]rovide[s] adequate drainage for the track" (*see supra* n.4), serves with § 213.33 to "cover the subject of drainage under and around the tracks." (CSX's Br. at 27-28.) The railroad provides no argument, however, for how § 213.103 subsumes state storm water trespass law other than as a tag-along to § 213.33. We therefore confine our analysis to CSX's arguments regarding § 213.33.

20

claim; it must "substantially subsume" it. *Easterwood*, 507 U.S. at 664. The railroad's argument for preemption here has even less to recommend it than the argument in *Strozyk* that a regulation requiring vegetation to be trimmed away from signs preempted a claim that overgrown vegetation created an unsafe crossing. *Stozyk*, 358 F.3d at 273. We cannot read the silence of § 213.33 on a railroad's duties to its neighbors when addressing track drainage as an express abrogation of state storm water trespass law. Given that the FRSA provides no express authorization for disposing of drainage onto an adjoining property, the presumption must be that state laws regulating such action survive, *see Easterwood*, 507 U.S. at 668 (noting that preemption is improper when "the regulations provide no *affirmative indication* of their effect on negligence law" (emphasis added)).

Second, the type of harm sought to be avoided by § 213.33 is wholly different than the harm alleged by MD Mall. Several courts interpreting the Federal Employers Liability Act ("FELA"), 45 U.S.C. §§ 51-60, which protects railroad employees from railroad negligence,[10] have held that

---

[10] Although FELA is a federal statute and federal preemption "is inapplicable to a potential conflict between two federal statutes," *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 86 (2d Cir. 2006), there is a general consensus that "the uniformity demanded by the FRSA 'can be achieved only if [FRSA regulations] are applied similarly to a FELA plaintiff's negligence claim and a non-railroad-employee plaintiff's state law negligence claim.'" *Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426, 430 (6th Cir. 2009) (quoting *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443 (5th Cir. 2001)); *see also id.* ("Dissimilar treatment of the claims

21

"whether compliance with applicable FRSA safety regulations precludes a finding that a railroad has been negligent" depends in large part on whether the regulations in question "directly address[] the type of harm that ultimately resulted." *Cowden v. BNSF Ry. Co.*, 738 F. Supp. 2d 932, 937 (E.D. Mo. 2010); *see also Kansas City S. Ry. Co. v. Nichols Constr. Co.*, 574 F. Supp. 2d 590, 599 (E.D. La. 2008) ("[T]he types of dangers and precautions contemplated by a railroad safety regulation are determinative of whether or not a railroad's compliance with regulations will shield it from liability."). If the regulations do address the type of harm alleged, "the compliance with [those] regulation[s] will preclude a finding of liability … ." *Cowden*, 738 F. Supp. 2d at 937. On the other hand, if a plaintiff's injuries "come about in a way not contemplated by a safety regulation, then the railroad's compliance with that regulation might not preclude its having failed to exercise a reasonable standard of care." *Nichols Constr*, 574 F. Supp. 2d at 599. "Numerous courts have applied this general principle in finding that a

would have the untenable result of making the railroad safety regulations established under the FRSA virtually meaningless: The railroad could at one time be in compliance with federal railroad safety standards with respect to certain classes of plaintiffs yet be found negligent under the FELA with respect to other classes of plaintiffs for the very same conduct." (internal quotation marks omitted)). As a result, courts apply the principles distilled by *Easterwood* and its progeny in determining whether a claim under FELA is substantially subsumed, and therefore precluded, by railroad safety regulations enacted pursuant to the FRSA, and we accordingly apply the reasoning of the FELA cases by analogy.

22

given FRSA regulation was or was not intended to prevent the harm the plaintiff suffered, and that the defendant railroad's duty of care accordingly was or was not subsumed by the regulation." *Cowden*, 738 F. Supp. 2d at 938. *Compare Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443 (5th Cir. 2001) (excessive-speed claim precluded by FRSA regulations concerning speed limits), *with Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 86 (2d Cir. 2006) (holding that a railroad employee could bring a negligence claim against his employer for hearing loss resulting from long-term exposure to train horns because no FRSA preclusion existed, as the FRSA only prescribed minimum sound levels for warning devices on trains).

Section 213.33 is, by CSX's own admission, plainly intended to prevent water from pooling on or around railroad tracks and thus to avoid potentially dangerous conditions occasioned by standing water, such as the presence of debris on tracks, icing conditions, and compromised track integrity. There is no indication whatsoever that it was intended to address storm water discharge onto a neighboring property, which is the harm alleged by MD Mall.[11]  Again, CSX

---

[11] The dissent claims that, in looking to the type of harm sought to be avoided by an FRSA regulation, we are flouting *Easterwood*'s "unequivocal instruction" that, "in determining the preemptive effect of a regulation, the only question is whether the regulation *covers* the subject matter." (Dissent Op. at 5 (citing *Easterwood*, 507 U.S. at 664).)  As proof, the dissent points to a statement in *Easterwood*, made with reference to an FRSA regulation governing train speed, that the FRSA's preemption provision "does not … call for an inquiry into the Secretary's purposes, but instead directs the

courts to determine whether regulations have been adopted that in fact cover the subject matter of train speed." *Easterwood*, 507 U.S. at 675. By looking to the purpose behind an FRSA regulation, the dissent insists, "we divert our attention from the 'coverage' of [§ 213.33]," and "we disregard the preemption analysis required under *Easterwood*." (Dissent Op. at 6.)

Our colleague's reading of *Easterwood* is out of context. When the Supreme Court made that statement, it had already established that the train speed regulation in question "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Easterwood*, 507 U.S. at 675. In other words, the harm sought to be avoided by the relevant regulation was the danger posed by fast moving trains. The plaintiff below "nevertheless maintain[ed] that pre-emption is inappropriate because the Secretary's primary purpose in enacting the speed limits was not to ensure safety at grade crossings, but rather to prevent derailments." *Id.* Having already determined that the regulation covered "train speed" with respect to, among other things, "conditions posed by grade crossings," the Court saw no justification for delving into the relative weight of the particular railroad safety concerns the Secretary had in mind when promulgating the regulation. *Id.*

Our dissenting colleague counters that "[t]he nature of the harm [addressed by a regulation] is … irrelevant in determining 'coverage.'" (Dissent Op. at 6 n.7.) That, however, denies that the purpose of a regulation bears on its scope. We see nothing in *Easterwood* to support that extraordinary claim, which is contrary to ordinary rules of construction, in general, *see Crandon v. United States*, 494

24

U.S. 152, 158 (1990) ("In determining the meaning of [a] statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."), and to well-settled rules for evaluating the preemptive scope of federal statutes and regulations, in particular, *see Altria Grp.*, 555 U.S. at 76 ("Our inquiry into the scope of a statute's pre-emptive effect is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption case." (alteration and internal quotation marks omitted)).

An analogy to § 213.33 brings clarity to the matter. Section 213.33 seeks to prevent harms associated with water pooling on or around railroad tracks – harms such as icing conditions, compromised track integrity, a greater likelihood of dangerous obstructions occasioned by standing water, and the like. An allegation that such conditions led to an accident would be "covered" by § 213.33, regardless of whether the actual harm caused by the alleged condition was great (*e.g.* a train derailment) or relatively small (*e.g.* a slip and fall). Whether the Secretary had train derailments foremost in mind in promulgating § 213.33 is irrelevant, in other words, because the regulation seeks generally to avoid harms caused by an inadequately drained track.

Related as it is to railroad safety – as it must be under 49 U.S.C. § 20106(a)(2) – § 213.33 does not seek to avoid the harms associated with a railroad's discharge of storm water onto an adjoining property. Whether the railroad disposes of its runoff by channeling it to the public storm water system or to its neighbor's property is irrelevant to the regulation's railroad safety purpose. And given that the regulation and the FRSA do not otherwise relieve railroads of their state law duties to their neighbors we are reluctant to hold that § 213.33

25

pressed its understanding of § 213.33 at oral argument in the District Court, saying that § 213.33 "is a drainage regulation" that "essentially" tells railroads "to keep the water off the tracks because it's dangerous to have water there, because it will deteriorate the track." (Supplemental App. at 133.) CSX represented that "the intent of" the drainage regulation "is to keep water away from the tracks, that's it." (Supplemental App. at 133.) It is accordingly difficult to conclude that § 213.33 "was … intended to prevent the harm plaintiff suffered," *i.e.*, storm water trespass, or "that the defendant railroad's duty of care" with respect to state storm water trespass law was "subsumed by the regulation." *Cowden*, 738 F. Supp. 2d at 938 (citations omitted).

Finally, the position advocated by CSX – that because § 213.33 does not prohibit storm water discharge onto adjoining property it therefore permits it – is troubling because, as the Tenth Circuit said in *Emerson v. Kansas City Southern Railway Co.*, 503 F.3d 1126 (10th Cir. 2007), it "has no obvious limit, and[,] if adopted," could "lead to absurd results." *Id.* at 1132. Although *Emerson* interpreted a question of preemption under the Interstate Commerce Commission Termination Act (the "ICCTA"), the Tenth Circuit's observations about the limitless and absurd results occasioned by an expansive interpretation of an express preemption provision are pertinent here, especially in light of the FRSA's solicitude for state law. *See Easterwood*, 507 U.S. at 664 (noting that the FRSA's preemption provision "displays considerable solicitude for state law").

---

"covers" MD Mall's storm water discharge claims.

26

The plaintiffs in *Emerson* alleged that, when the defendant railroad replaced old, deteriorated rail ties, it "regularly discarded" the ties in a nearby drainage ditch. *Emerson*, 503 F.3d at 1128. The ditch consequently became clogged, and the plaintiffs' property flooded. *Id.* The railroad argued that subjecting it to liability for discarding old rail ties would interfere with the ICCTA, which provides that "remedies … with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). The court rejected that argument, reasoning that "[i]f the ICCTA preempts a claim stemming from improperly dumped railroad ties, it is not a stretch to say that the Railroad could dispose of a dilapidated engine in the middle of Main Street – a cheap way to be rid of an unwanted rail car." *Emerson*, 503 F.3d at 1132. "After all," the court continued, "in this hypothetical … the Railroad is merely disposing of unneeded railroad equipment in a cost-conscious fashion. Our holding [rejecting the railroad's demand for sweeping preemption] … interprets the ICCTA's preemption clause such that this absurd result is avoided." *Id.*

In line with that persuasive reasoning, we must take a sensible view of the FRSA's preemption provision, avoiding the carte blanche ruling the railroad seeks. Longstanding state tort and property laws exist for a reason, and the FRSA's laudatory safety purpose should not be used as a cover to casually cast them aside. *See Easterwood*, 507 U.S. at 668 (noting that preemption is improper when "the regulations provide no affirmative indication of their effect on negligence law"). For if CSX is free to negligently discharge its storm water onto its neighbor's property, why should it not be allowed to do so intentionally? It might simplify CSX's

27

duties under § 213.33 if it could simply install drainage pipes that empty directly onto adjoining properties. Judging by the testimony of CSX's road master, who stated that CSX's sole concern when conducting the 2009 track refurbishment was to ensure that storm water drained away from the track and that it was not concerned about storm water discharging onto the adjoining property, and given CSX's argument in the District Court that § 213.33 allows a "railroad [to] do whatever it needs to do to keep water away" from the railroad track, including directing it onto a neighbor's property (Supplemental App. at 131, 133), and further given the attempt by the railroad in this case to build a spillway emptying directly into the Mall's storm drain, CSX's position is not far removed from that extreme. The constrained scope given to the FRSA's preemption provision by the Supreme Court in *Easterwood* cannot support such an understanding of § 213.33.[12]

---

[12] The dissent characterizes our analysis as holding that, "even if [the] FRSA clearly covers the conduct of a railroad, such that the matter is preempted under *Easterwood*, a claimant could, nonetheless, assert a claim for any resulting or consequential injury that flows from the covered conduct." (Dissent Op. at 4.) Viewing our analysis in that way, the dissent claims that we "gut … preemption analysis" and "turn[] preemption on its head," which "will bring about needless confusion in our jurisprudence as to the proper preemption analysis." (*Id.* at 9.) Our opinion here does no such thing. When a regulation covers (in that it substantially subsumes) a plaintiff's state law claims, the FRSA applies, and the suit will be preempted, assuming the Clarification Amendment does not revive it. Our conclusion is that § 213.33, which requires railroads to maintain systems that

28

Accordingly, we hold that the FRSA's express preemption provision does not apply to MD Mall's claims.

## C.   *Implied Conflict Preemption*

Even though the FRSA's express preemption provision does not operate to extinguish MD Mall's claims, the present lawsuit may be "pre-empted by implication because the state-law principle [it] seek[s] to vindicate would conflict with federal law." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).[13]   A court may find implied conflict pre-emption "where it is impossible for a private party to comply with both state and federal law," *Crosby v. Nat'l Foreign Trade*

---

adequately drain water away from the track, does not substantially subsume MD Mall's claims regarding water discharge onto their property, not that MD Mall's claims may proceed even though § 213.33 covers its claims.

[13] The Court in *Myrick* rejected "the argument that [it] need not reach the conflict pre-emption issue at all" because "implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute." *Myrick*, 514 U.S. at 287.  At the same time, however, the Court acknowledged that prior case law "supports an inference that an express pre-emption clause forecloses implied pre-emption; [though] it does not establish a rule." *Id.* at 289; *see also id.* at 288 ("The fact that an express definition of the pre-emptive reach of a statute 'implies' – *i.e.*, supports a reasonable inference – that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption.").

*Council*, 530 U.S. 363, 373 (2000), or "where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (alterations and internal quotation marks omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute [or regulation] as a whole and identifying its purpose and intended effects … ." *Id.* "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *Madeira v. Affordable Housing Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006). Rather, "[t]he principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Jones v. Rath Packing Co.*, 430 U.S. 519, 544 (1977) (Rehnquist, J., concurring in part and dissenting in part) (quoting *Kelly v. Washington*, 302 U.S. 1, 10 (1937)) (internal quotation marks omitted).

Conflict preemption thus embraces two distinct situations. In the easier but rarer case, compliance with both federal and state duties is simply impossible. *See, e.g.*, *Southland Corp. v. Keating*, 465 U.S. 1 (1984) (state law requiring judicial determination of certain claims preempted by federal law requiring arbitration of those claims). In the second and more common situation, compliance with both laws is possible, yet state law poses an obstacle to the full achievement of federal purposes.

30

We can confidently conclude that this case is not of the former variety. As CSX's engineers suggested when studying the breakdown of the berm, the runoff problem is remediable, though at some cost to the company, and it is therefore not impossible for CSX to comply both with Pennsylvania storm water trespass law and § 213.33. It would indeed be odd to conclude that dual compliance is not possible given that CSX successfully did just that for a number of decades without difficulty.

We are less confident, however, in saying that Pennsylvania law does not, "under the circumstances of [this] particular case, … stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373 (internal quotation marks omitted). We do not know, because the District Court made no findings of fact, whether and to what extent, if any, Pennsylvania law stands as an obstacle to the accomplishment and execution of § 213.33's railroad safety purpose. Whether CSX can employ reasonable means to comply with § 213.33's drainage requirements in this specific case while also complying with Pennsylvania law regarding storm water trespass is a question of fact. *See Arizona v. United States*, __ U.S. __, 132 S.Ct. 2492, 2515 (2012) (Scalia, J., concurring in part and dissenting in part) (arguing that "[i]t is impossible" to "'determine whether, *under the circumstances of this particular case*, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," without "a factual record concerning the manner in which Arizona is implementing" state law); James T. O'Reilly, Federal Preemption of State and Local Law: Legislation, Regulation

31

and Litigation 72 (2006) (stating that conflict preemption analysis "requires … attention to the facts of each case").

It may be that, in the maintenance of the drainage facilities that are under and immediately adjacent to the portion of the track in question, CSX is unable, through reasonable means, to prevent the flow of storm water onto MD Mall's property. Again, since the railroad managed for years to deal with its drainage without affecting the Mall, one wonders how it can have become an unreasonable burden now, but we have virtually no factual record on the issue and so cannot definitively address it. The District Court is in a better position to make the necessary factual inquiry, and we will therefore remand for the development of an appropriate record.[14]

---

[14] Of course, any analysis of conflict preemption requires an inquiry into the dictates of the state law in question, for if state law does not prohibit a railroad from discharging storm water onto an adjoining land under the circumstances of this case, there is no conflict of law. Because the District Court did not evaluate the underlying merits of MD Mall's storm water trespass or negligence claims, but rather avoided them on FRSA preemption grounds, on remand we will allow the District Court to have a first pass at those questions. *Cf. Strozyk*, 358 F.3d at 278 (reversing district court's preemption holding and "leav[ing] the issue of whether or not the railroad met its duty of care, and the relevant standard, for the District Court and the fact finder on remand").

In addition, we will leave it to the District Court on remand to address, if necessary, CSX's additional argument that MD Mall's claims are preempted under the ICCTA, the

## IV.   Conclusion

For the foregoing reasons, we will vacate the District Court's order granting summary judgment in CSX's favor, and will remand the case for further proceedings consistent with this opinion.

---

Interstate Commerce Commission Termination Act.

Finally, given our invocation of the public importance exception to the waiver doctrine to allow MD Mall to press its new argument, MD Mall is estopped from arguing on remand that § 213.33 imposes a duty on CSX to prevent storm water discharge onto a neighboring property and that CSX failed to comply with the supposed standard of care created by that duty.  Otherwise, we would be allowing MD Mall for the third time to "assert[] a position inconsistent with one that [it] [had] previously asserted in … a previous proceeding." *Macfarlan*, 675 F.3d at 272 (internal quotation marks omitted).

33

MD Mall Associates, LLC v. CSX Transportation

No. 12-1934

---

**RENDELL**, <u>Circuit Judge</u>, *dissenting*.

I dissent from the majority's opinion because I believe its analysis veers from Supreme Court precedent in the area of FRSA preemption. When the Mall commenced this action in District Court complaining of CSX's failure to maintain its stormwater drainage, it urged that, applying the "coverage" test for preemption that the Supreme Court established in *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658 (1993), its claims were clearly covered by 49 C.F.R. § 213.33. Section 213.33 provides:

> Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned.

The Mall contended that, although the regulation covered the subject matter of its state law claims, the claims were not preempted because the Clarifying Amendment applied.[1] That Amendment provides that FRSA does not

---

[1] *See, e.g.,* S.A. 98-99 ("Therefore*, based upon the clarifying amendment*, claims alleging that the railroad failed to comply with federal regulations are not preempted by the FRSA.") (emphasis added), S.A. 110-13, S.A. 160-61, S.A. 165 ("We are suing under a state law that is

preempt claims for damages if they allege a violation of a "[f]ederal standard of care" or the railroad's "own plan, rule, or standard that it created pursuant to a regulation or order." 49 U.S.C. § 20106(b)(1)(A)-(B).

The District Court agreed with the Mall that § 213.33 covered the subject matter of the Mall's state law claims, but held that the Clarifying Amendment did not apply because the Mall requested only injunctive relief—not damages. Dissatisfied with this result, the Mall now comes to our Court with a new approach for gaining an injunction. It now contends that § 213.33 does "not even relate to, let alone cover, a railroad's discharge of stormwater onto an adjoining property." (Appellant's Opening Br. at 11.) In other words, it argues the direct opposite of what it pleaded and consistently urged below.

In furtherance of this epiphany, the Mall urges that CSX's stormwater is not really a drainage issue that § 213.33 regulates. Rather, it contends that the stormwater should be viewed as "flow" or "runoff" onto an adjoining property. The majority has embraced this argument. I conclude, however, that the Mall was right the first time: § 213.33 clearly covers the subject matter of its claims, and under *Easterwood*, that is the only issue that matters. In *Easterwood*, the Supreme Court framed the critical preemption FRSA inquiry: does the regulation at issue "substantially subsume the subject matter of the relevant state law[?]" 507 U.S. at 664. Here, it does. The Mall's position on appeal ignores *Easterwood*'s command, and is

identical to federal regulations, they both say the same thing . . . thou shall maintain your water.").

2

flawed from a physical, analytical, and practical standpoint.

First, an examination of the physical layout of the area reveals that the hillside leading to the Mall's property—the site of the alleged negligence—*is immediately adjacent* to the roadbed.[2] A picture tells a thousand words, and the photo attached to this opinion demonstrates the requisite proximity.[3] Can there be any doubt that the regulation "covers" the drainage in this area? I think not.

Second, analytically, the Mall's own characterization of CSX's misconduct belies its assertion that § 213.33 does not cover CSX's conduct. The Mall repeatedly and consistently articulates CSX's conduct as its failure to

---

[2] "Roadbed" refers to "the area under and adjacent to the tracks." *Anderson v. Wis. Cent. Transp. Co.*, 327 F. Supp. 2d 969, 979 n.11 (E.D. Wis. 2004); *accord Mo. Pac. R.R. v. R.R. Comm'n of Tex.*, 948 F.2d 179, 182 (5th Cir. 1991). "Immediately adjacent" is ten to fifteen feet. *Anderson*, 237 F. Supp. 2d at 980; *Hadley v. Union Pacific R. Co.*, No. Civ.A. 02–1901, 2003 WL 21406183, at *2 (E.D. La. June 16, 2003).

[3] Ditch lines abut and run parallel to the roadbed. When it rains, water flows from the roadbed into the ditches. The Mall contends that the drainage problem is the result of CSX's failure to maintain the ditch that borders the Mall's property. (A. 119 (Compl. ¶¶ 10-11).) Although the parties do not provide the dimensions of the area, it is clear that the ditch line is immediately adjacent to the roadbed.

3

manage the storm water on its property[4]—*exactly* what § 213.33 requires CSX to do. According to the Mall and the majority, however, the fact that § 213.33 addresses the very conduct that the Mall contests does not matter in evaluating whether the regulation covers the subject matter of the Mall's claims. Rather, they contend that what matters is the result—here, runoff onto the Mall's property. This position is captured in the Mall's Complaint: the continuing trespass claim is the result of CSX's "failing to properly control its stormwater and maintain the CSX Property so that its stormwater does not overflow onto MacDade's property." (A. 123 (Compl. ¶ 30).) But, the "flow" or "runoff" onto the Mall's property is not the negligent act complained of, it is *the result*. If we were to adopt the majority's position, we would be holding that even if FRSA clearly covers the conduct of a railroad, such that the matter is preempted under *Easterwood*, a claimant could, nonetheless, assert a claim for any resulting or consequential injury that flows from the covered conduct.

---

[4] *See* Am. Compl. at A. 117, A. 121, A. 123; MD Mall's Mem. of Law in Supp. of MD Mall's Motion for Summ. J. at S.A. 71, S.A. 82, S.A. 90 ("CSX is clearly not accommodating the expected water flow from its property, as required under Section 213.33."), S.A. 91 ("CSX has failed to properly control its water run-off from illegally discharging on to [sic] the Mall Property."); MD Mall's Response in Opp. to CSX's Motion for Summ. J. at S.A. 93-94 ("CSX should be managing its stormwater so that it drains without causing damage to the Mall property."), S.A. 99; Appellant's Br. at 14, 29 ("[T]he stormwater problem arose on [CSX's] property and it controls its property."); Appellant's Reply Br. at 26.

4

This position renders preemption toothless and cannot withstand analytic scrutiny. Simply put, that CSX's failure to comply with § 213.33 leads to a result that harms another is not a basis to ignore the preemptive effect of the regulation and permit a claim to be brought for that harm.[5]

The Mall and the majority arrive at this conclusion by focusing on what they believe to be the intent of the regulation. The majority reasons: "There is no indication whatsoever that it was *intended* to address storm water discharge onto a neighboring property, which is the harm alleged by MD Mall." *See* Majority Op. at 23 (emphasis added). However, this approach is directly contrary to the Supreme Court's unequivocal instruction in *Easterwood*. There, the Supreme Court stated that in determining the preemptive effect of a regulation, the only question is whether the regulation *covers* the subject matter. 507 U.S. at 664. The Supreme Court explicitly stated that the intent of the regulation was not to be considered: "Section 434[6] does not, however, call for an inquiry into the Secretary's purposes, but instead directs the courts to determine whether regulations have been adopted that in fact cover the subject matter of train speed." *Id*. at 675. Here, if we substituted "storm water drainage adjacent to the roadbed"

---

[5] If this were not the case, the Clarifying Amendment's allowance of claims for resulting harm would have been unnecessary. The Clarifying Amendment applies to claims for damages for actual harm, and the District Court correctly held that injunctive relief is not allowed. That is the province of the Secretary of Transportation, as I note below.

[6] Referring to FRSA's preemption provision.

for "train speed", it is clear that the necessary "coverage" exists. The Secretary has adopted a regulation that explicitly addresses "drainage . . . immediately adjacent to the roadbed," and the Mall is claiming that under state law, CSX is negligent in how it handles its stormwater adjacent to the roadbed. If we divert our attention from the "coverage" of this regulation—of which there can be no doubt here—we disregard the preemption analysis required under *Easterwood*.[7]

---

[7] The majority's reading of the analysis in *Easterwood* as concerned with the harm that the regulation was intended to prevent, *see* Majority Op. at 23 n.11, is incorrect. *Easterwood* involved an inquiry into whether a very specific regulation—setting train speed caps—should be read expansively to cover, i.e. subsume, the subject matter of train speed safety. The Supreme Court was determining the scope of the regulation—*not*, as the majority posits, "the harm sought to be avoided by the relevant regulation." Majority Op. at 23 n.11. These are different inquiries. The Supreme Court adopted an expansive view of the scope of the regulation, based on an examination of what was considered in adopting the regulation—overall safety, not merely speed caps. 507 U.S. at 674-75. Interestingly, however, the majority seems to agree with my view that once the Supreme Court in *Easterwood* concluded that the scope of the regulation was train speed safety, it held that it did not need to delve into the harms that the regulations were intended to avoid, namely derailments. *See* Majority Op. at 23 n.11. The nature of the harm is, therefore, irrelevant in determining "coverage." That leads inexorably to the conclusion that, here, once we have concluded that the scope of the regulation covers the

6

The sparse case law discussing § 213.33 is consistent with this reasoning. For example, in *Rooney v. City of Philadelphia*, property owners brought suit against AMTRAK alleging that runoff and drainage problems resulted in flooding that "caus[ed] extensive damages to Plaintiffs' properties and businesses." 623 F. Supp. 2d 644, 648 (E.D. Pa. 2009). The court concluded that FRSA regulations, including 49 C.F.R. § 213.33, governed, among other things, "[d]rainage requirements", and as a result, "cover[ed] the subject matter at issue." *Id*. at 666. In *Black v. Baltimore & Ohio Railroad Co*., plaintiffs initiated suit against the railroad alleging that "pumping actions in low joints, lack of good crossties, ballast and poor drainage" created muddy conditions that were hazardous to trainmen. 398 N.E.2d 1361, 1362 (Ind. Ct. App. 1980). The court held that although there was no "specific regulation dealing with muddy conditions," plaintiff's claims were preempted because FRSA regulations, including 49 C.F.R. § 213.33, covered the "conditions that are alleged to have contributed to the" muddy conditions. *Id*. at 1363. Recently, in *Miller v.*

proper management of stormwater drainage adjacent to the roadbed—which is what the Mall contends is the cause of its problem—we should not consider the assertion that the regulation was aimed at the integrity of the tracks, not runoff. Had *Easterwood* been decided along the lines that the Mall and the majority urge, the Court would have concluded that because the speed cap was aimed at preventing derailments, not collisions with automobiles at grade crossings, the claim would not be preempted. As we know, that reasoning was not only *not* adopted by the Supreme Court—it was explicitly rejected.

7

*SEPTA*, the court, citing the clear mandate of *Easterwood*, went so far as to conclude that a plaintiff's claim was preempted under § 213.33 where the railroad's poorly maintained railroad bridge obstructed the flow of a stream and caused the stream to flood the plaintiff's property. No. 1876 C.D.2011, 2013 WL 830715 (Pa. Commw. Ct. Mar. 7, 2013). Here, we have a much clearer case of "coverage." The Mall's claims arise directly from an alleged drainage problem that is immediately adjacent to the tracks.[8]

Further, the Mall's and the majority's position that a court may dictate how a railroad handles its stormwater drainage runs afoul of FRSA's statutory scheme. FRSA states that the Secretary of Transportation has the "exclusive authority" to "request an injunction for a violation of a railroad safety regulation." 49 U.S.C.

---

[8] The majority does not cite one case that addresses § 213.33. In discussing whether the regulation "covers" the subject matter of the Mall's claims, the majority cites cases where the regulation "merely touched upon" the subject matter of a plaintiff's claims or cases that did not reach the issue in the fact pattern before this court. The majority relies heavily on *Emerson v. Kansas City Southern Railway Company*, 503 F.3d 1126 (10th Cir. 2007). That case is inapposite. There, the Tenth Circuit Court of Appeals addressed ICCTA preemption—not FRSA preemption—and analyzed whether the "regulation of rail transportation" covered the railroad's discarding old railroad ties into a drainage ditch. The issue of coverage is much clearer here, as § 213.33 actually regulates drainage.

§ 20111(a)(2). The scope of the work to be done to remedy the condition at the CSX roadbed, berm, and adjacent hillside is the concern of the Secretary. The proposition that a court should refrain from involving itself in that subject matter is what preemption is all about. The consistency, uniformity, and safety concerns, that underlie these types of regulations should not be minimized or ignored.

Finally, from a practical perspective, there is no reason to gut our preemption analysis to provide the Mall with a remedy. To the extent the Mall is actually harmed, the Mall could proceed under the Clarifying Amendment with a request for damages for any property damage that it suffers—as it did originally before limiting itself to injunctive relief. The Mall could also bring the matter to the attention of the Secretary of Transportation, requesting that he issue an injunction that compels CSX to comply with § 213.33.

For the foregoing reasons I believe that the Mall's position, which the majority adopts, is flawed. The most important reason, however, is that it runs afoul of *Easterwood*'s holding that the key question is whether the regulations "substantially subsume the subject matter" of the relevant state law. Here, § 213.33 does just that. *Easterwood* is very clear, but the majority's holding turns preemption on its head and will bring about needless confusion in our jurisprudence as to the proper preemption analysis. I, therefore, respectfully dissent.



107